**In re COMBUSTION, INC.**

**Civil Action No. 94MDL4000.**

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 4, 1997.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## RULING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

I. Overview ............................................................ 1119

II. Background .......................................................... 1119
 A. Facts ........................................................... 1119
 B. Procedure ....................................................... 1120
 C. Proof of Claim Forms ........................................... 1121
 D. Negotiations and Settlements .................................... 1122

III. Law—Approval of Proposed Partial Settlements ...................... 1124

IV. Analysis ............................................................ 1125
 A. Preliminary Approval ............................................ 1125
 B. Notice .......................................................... 1125
 C. Fairness, Reasonableness, and Adequacy ......................... 1126
 D. *Reed* factors .................................................. 1126
 1) Existence of Fraud or Collusion .......................... 1126
 2) Complexity, Expense and Duration of the Case ............. 1127
 3) Stage of the Proceedings ................................. 1127
 4) Probability of Plaintiffs' Success on the Merits .......... 1127
 5) Range of Possible Recovery ............................... 1128
 6) Opinions of Class Counsel, Class Representatives, and Absent Class Members ................................................ 1129
 E. Objections to the Proposed Settlements .......................... 1129
 F. Conclusion—Phase I ............................................. 1129

V. Partial Disbursement—Phase II ...................................... 1129
 A. Overview ........................................................ 1129
 B. Reserves ........................................................ 1131
 1. Indemnity and Liability Reserves ......................... 1131
 2. Litigation, Class Administration, and Class Distribution Reserves ....... 1131
 3. Attorneys' Fees .......................................... 1131
 a) Methodology ......................................... 1132
 i) Percentage of Fund ............................. 1132
 ii) Lodestar-risk Multiplier ....................... 1133
 iii) Fifth Circuit Methodology ...................... 1134
 b) Analysis—methodology ................................ 1135
 c) Application of *Johnson* Factors ...................... 1136
 i) Time and Labor Required ........................ 1136
 ii) Novelty and Difficulty of the Questions Involved .............. 1137
 iii) Skill Required to Perform the Legal Services Properly ......... 1137
 iv) Preclusion of Other Employment ................. 1137
 v) Customary Fee .................................. 1138
 vi) Whether Fee is Fixed or Contingent ............. 1138
 vii) Time Limitations Imposed by the Client ......... 1138
 viii) Amount Involved and the Results Obtained ....... 1138
 ix) Experience, Reputation and Ability of the Attorneys Involved ...... 1138
 x) Undesirability of the Case ..................... 1138
 xi) Nature and Length of the Professional Relationship with the Client ..... 1139
 xii) Awards in Similar Cases ........................ 1139
 C. Objections to Phase II .......................................... 1141

VI. Conclusion ......................................................... 1142

HAIK, District Judge.

## I. Overview

A monumental milestone in *In re Combustion* is now before the Court. Plaintiffs' Steering Committee (PSC) and some 450 defendants, third party defendants, and insurers have jointly submitted to the Court four preliminary settlement agreements for approval as proposed. The result for these settling parties will be dismissal with prejudice from the tort portion of this case. In addition, the PSC and the Special Master are presenting to the Court for approval the initial steps toward partial disbursement to the Class of settlement funds. The target date for disbursement is this fall.

Cabinets of files, rooms of cabinets, offices, teams, dedicated fax machines, liaison counsel, two law clerks, 11 years of litigation, ranks of *Combustion* widows and widowers describe the efforts dedicated to this case. In the opinion of this Court, echoed at three annual Judges Conferences on Multi-district Litigation, this case is unique in the category of class actions. For example, it is unique in the sheer numbers of defendants—80 primary, hundreds of third party, and hundreds of the insurers—and unique in that the law of Louisiana allows the tort victim to sue the tortfeasor's insurer directly. In this case, the PSC litigated tort liability against the primary and third party defendants, and tort liability and coverage against the insurers. Meanwhile, the primary defendants filed claims for contribution and cost recovery under CERCLA against the third party defendants, and tort and CERCLA indemnity against their insurers.

Approval of the settlements currently before the Court will leave only one primary tort defendant. Insurance coverage issues remain as well. But with regard to the Class, after the Court's decision regarding the maximum reserves currently being considered, the Special Master is directed to proceed with his plan to disburse funds to the Claimants in the fall of this year. For the reasons articulated below the court approves the four preliminary settlement agreements as proposed and approves the six reserves as proposed by the Special Master, with the Stipulations listed below.

## II. Background

### A. Facts

The Dubose operation—Combustion, Inc. site was a waste-oil recycling, reclamation facility located in Livingston Parish, Louisiana. It operated from 1964—1982 and consisted of a process area containing boiler equipment, storage and process tanks, and a 7.5 acre pond area.

In the early 1960's, Earl Dubose built a house and trucking yard and began the operation of what he termed an oil recycling and fuel oil resale business on a piece of land behind his home. Residential properties surrounded the waste site. Initially, Dubose collected waste oil from service stations, dealerships, and garages and processed the oil in pits he dug, lined naturally with clay but no additional synthetic material. In 1973, he expanded his operations by picking up used oil and other materials from industrial sources.

Early processing consisted of allowing the waste oil to separate naturally from other waste materials simply by the force of gravity. Later Dubose found that heating the waste oil accelerated the separation process, and adding chemicals such as toluene increased the flammability and resale value of the recycled product. Dubose stored and sold the final product as fuel oil. However, during the Dubose years, stench permeated the area, fires erupted at the facility, severe rains caused extensive flooding of the ponds into bordering canals and property, and several large oil spills occurred.

In 1977, Dubose sold the business to H. Arthur Gammons. Mr. Gammons incorporated the business under the name "Combustion, Inc." and continued a similar but slightly more sophisticated operation until 1982

when he closed Combustion, Inc. because of financial and regulatory problems.

In 1985, the Louisiana Department of Environmental Quality (DEQ) became involved in this matter, as did the United States Environmental Protection Agency (EPA). The Combustion, Inc. site was listed on the National Priorities List as a Superfund site. The DEQ issued letters to "potentially responsible parties" (PRPs) it determined had disposed of used oil or chemicals at the site. In response to action by the DEQ, a group of approximately 23 PRPs formed a committee to clean up the site. To date remediation expenses exceed $17 million and could escalate tremendously if current testing reveals groundwater contamination.

## B. Procedure

More than 10,000 individuals have completed Proof of Claim forms asserting both personal injury and property damage as a result of the operation of the waste site. In addition to the claims against the site owner-operators, Plaintiffs allege culpability on the part of approximately 800 "generator"—and "transporter"—type defendants who caused or contributed or delivered waste oil or toxic chemicals to the site over the twenty-year life of the operation. In addition, Plaintiffs claim injury and damages from exposure to these toxins as a result of fires and floods at the site through 1994, when the site cleanup procedures were substantially completed. The allegations of harm resulting from exposure to toxic chemicals during recycling and during fires, floods and spills range from fear, fright and anxiety to wrongful death claims. Property damage claims run the gamut from contamination to diminution in value because of proximity to the site.

Specifically, this matter was initiated in 1986 in state court in Livingston Parish, Louisiana. Seventeen separate suits asserting six causes of action against approximately 80 defendants were filed in the Twenty-first Judicial District Court. One of these suits was filed on behalf of a class of persons asserting claims related to the site.

The complaints allege that the defendants are absolutely liable under La. Civ. C. art. 667, art. 2315, and art. 2317 for engaging in ultrahazardous activities consisting of disposing of and storing dangerous, toxic chemicals at the site and contributing to the creation of an ultrahazardous instrumentality—the site itself. Plaintiffs allege that the nature of the hazardous substances generated by the defendants was such that damage to personal property within a certain proximity of the site could not be avoided even in the exercise of due care.

Plaintiffs allege strict liability under La. Civ. C. art. 2317 in the exercise of each defendant's unreasonable activity in causing or contributing to Plaintiffs' exposure to hazardous materials. To the extent that a defendant attempted to transfer *garde* of hazardous substances without ascertaining that the substances would be disposed of in a reasonably safe manner, that defendant is subject to strict liability for the damages caused by such activity. Plaintiffs claim this is true regardless of whether the defendant knew of the nature or the dangerous substances or knew of the method of disposal.

The complaint also alleges that defendants who generated the hazardous wastes are strictly liable under La. Civ. C. art. 2315 as interpreted with regard to Louisiana product liability jurisprudence. Plaintiffs contend defendants placed unreasonably dangerous products that caused harm into the stream of commerce. This cause of action arose prior to the adoption of the Louisiana Product Liability Act.

Plaintiffs allege that defendants are strictly liable for tort damages under the Louisiana Environmental Quality Act ("LEQA"), LSA–R.S. 30:2026, pertaining to the disposition of hazardous substances. This Act prescribes the course of conduct to be followed in Louisiana for the handling and disposition of hazardous substances.

Plaintiffs assert claims under La. Civ. C. art. 2315 that the defendants negligently engaged in activities in which there was an unreasonable risk of harm to plaintiffs, of which defendants knew or should have known. Plaintiffs further contend that the defendants violated various duties imposed upon them by law.

Finally, to the extent that any defendant's conduct subsequent to January 1, 1985 constituted reckless disregard for public safety in the transportation, storage, or handling of hazardous or toxic substances, liability may be imposed under Louisiana's punitive damages statute, La. Civ. C. art. 2315.3.

Pursuant to an order of the Louisiana court, plaintiffs in all seventeen suits combined their allegations into one Master Amending and Supplemental Petition asserting above claims on behalf of the individuals and the Class of persons in Livingston Parish. The class was certified by the state court and affirmed on appeal with the exception of the class definition, which was approved on the second appeal as follows:

All persons or entities who or which own real or personal property and/or live and/or operate places of business and/or work and/or attend school in Livingston Parish, Louisiana, and/or who have been so situated during the time since the early 1960's, and who or which claim to have sustained damages as a result of the discharge, release or leakage of toxic substances from the premises now or formerly know as Combustion, Inc., and/or Earl G. Dubose, located at Dubois Lane and Milton Road and Burgess Road in Livingston Parish, Louisiana.

Shortly after class certification, defendant McDermott, Inc. filed a third party demand against American Cyanamid in each of the seventeen pending suits for contribution or indemnification for any amount which McDermott might be held liable to plaintiffs and for the cost recovery action under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.* The matter was removed for the third time to the United States District Court for the Middle District Court of Louisiana on April 13, 1993, pursu-

ant to 28 U.S.C. § 1441(c). The basis for removal was the district court's exclusive jurisdiction over all claims brought under CERCLA.

In a flurry of motions, McDermott filed third party claims against approximately two hundred potential "generators" and "transporters" and brought claims against the United States Government. In addition, McDermott filed suits in United States District Courts in Alabama, Florida and Mississippi under CERCLA with supplemental state tort claims. McDermott then invoked a petition for Multi-district certification on September 22, 1993, permitting all suits to be consolidated for purposes of pre-trial proceedings pursuant to 28 U.S.C. § 1407.

In July of 1994, and by agreement of all parties, *Combustion* was transferred to the Western District of Louisiana under Judge Richard T. Haik, Sr., as both judges in the Middle District of Louisiana had recused themselves. In May 1995, this Court adopted the state court's class certification, and in July 1995 the district court denied Plaintiffs' motion to remand.

By Memorandum Order of July 5, 1995, this Court deemed Plaintiffs' claims asserted against all third party defendants. Further, in 1995 and 1996, the Court allowed Plaintiffs to assert a direct action pursuant to La. R.S. 22:655 *et seq.* against all insurers of the main and third party defendants and allowed all defendants and third party defendants to file cross-claims against their insurers.

The Court's Case Management and Scheduling Orders parceled this litigation into four phases. Phase I was the CERCLA trial. Phase II consisted of dispositive motions primarily on insurance contract defenses against the direct action Plaintiffs and the insureds, the defendants and third party defendants. Phase II was argued throughout the fall of 1996 and into 1997. Phase III is the tort trial, scheduled for September 29, 1997, and Phase IV will wrap up outstanding insurance contract disputes based on the factual determinations made in Phase III.

### C. Proof of Claim Forms

On May 26, 1994, pursuant to Fed. R. Civ. Pro. 23(d), this Court established a require-

ment that any class member who wished to assert a claim must complete a Proof of Claim form. The Court then ordered the PSC to give notice to all class members that the forms must be completed by December 31, 1994, later extended to April 11, 1995. More than 10,000 claim forms were filed timely.

Further, any class member who failed to complete a proof of claim form prior to the deadline was allowed the opportunity to contact the Court in writing prior to the first fairness hearing on September 26, 1995 and to show good cause why the party had not complied with the Court ordered deadline.

### D. Negotiations and Settlements

In August 1994, this Court established committees of plaintiffs', defendant's, and third party defendants' counsel for the purposes of settlement negotiations. After eight months of unsuccessful talks regarding a global settlement, the Court ordered the meetings to cease. In April 1995, defense counsel asked the Court to appoint a mediator to aid in partial settlement negotiations. Mr. Patrick Juneau was appointed Special Master on April 28, 1995.

The Special Master conducted negotiations through 1996. As a result of those mediations and of independent negotiations among counsel for various entities, seven partial settlement agreements have been presented to this Court. All agreements have been given preliminary approval by the Court as proposed, and the Court has held fairness hearings on the first two agreements, on September 26, 1994 and February 29, 1995, issuing Written Reasons and Final Judgments on February 7, 1996 and May 9, 1996 respectively.

In addition, the Court instructed the PSC to employ professional accountants to oversee the financial obligations of the parties to the first settlement agreement, the *Preliminary Settlement Agreement,* and for each successive settlement agreement. The accountants manage and supervise the Settlement Fund, including duties such as receipts and deposits, tax accounting, disbursements, review of PSC cost submissions, and advice to the Special Master in allocation protocol.

The accounting firms of Bourgeois Bennett and Postlethwaite & Netterville, APAC, fulfill these duties and are heretofore referred to as the court-appointed-disbursing-agents (CADA). *See also Transcript April 18, 1997, pp. 187–88.*

The four settlement agreements currently before the Court were presented to the Court for preliminary approval on August 26, 1996, September 18, 1996, January 8, 1997, and February 24, 1997 respectively. The list of compromising parties in each agreement is attached. *See Exhibit 1.* All settlement dollars were deposited in Regions Bank of Louisiana and First National Bank of Commerce, Trustee A and Trustee B, pursuant to the conditions of the *Escrow and Trust Agreement* made effective July 28, 1995 as part of the original *Preliminary Settlement Agreement.* The *Escrow and Trust Agreement* is one between the Trustees on the one hand and the PSC and Compromising Parties on the other. It has been "extended" to include each new set of compromising parties and each new settlement amount, including the agreements currently before the Court.

The Second, Third, and Fourth Supplemental Preliminary Settlement Agreements, document numbers 5826, 6074, 6833, track the two previously approved agreements. See *Written Reasons for Approval, document # 4160 at pp. 11–15 and # 4965 at pp. 11–13.* For a sum certain, commensurate with the volume and content of the waste sent to the site as alleged by the Plaintiffs, each settling defendant was dismissed from the litigation with prejudice as to all tort claims asserted or that may be asserted by the Class. Where noted, the PSC also was given an assignment of rights against that defendant's insurers to pursue whatever coverage that may have existed during the relevant time period. In addition, the PSC reserved all rights to pursue direct action claims against the insurers. Claims brought or claims that could be brought pursuant to CERCLA were also expressly preserved.

The Fifth Supplemental Preliminary Settlement Agreement, document #7b 7063, contains an *in globo* subscription agreement on behalf of almost 100 parties, eight are main

and third party defendants and the remaining are insurers. The 5th SPSA also contains four additional, individual subscription agreements. Terms of the *in globo* agreement are similar to the preceding agreements but also include the release of all tort and tort indemnity claims brought or that could have been brought by and between an Compromising Parties who are parties to the *in globo* agreement.

Specifically, the Second Supplement Preliminary Settlement Agreement, document # 5826, represents a compromise between the Plaintiffs and eleven defendants and several of their insurers, sixty-five parties altogether, for the sum of $1,747,000. *See Exhibit 1.* Each settlement is as follows: Bagwell Coating, Inc. and named insurers for $100,000 plus an assignment of all rights for insurance against unnamed insurers; Classic Car Imports for $1,000 plus an assignment of all rights for insurance; Deere & Company and named insurer for $75,000; Delta Commodities, Inc., Terminal (DC) Corp. and insurers named or otherwise for $825,000; Doran's Car Care for $1,000; Pirelli Armstrong Tire Corporation and The Armstrong Rubber Company and named insurers for $100,000; Southern Equipment, Inc. and named insurers for $120,000; Southern Steamship Agency, Inc. and Ralph Walsh, Inc. for $50,000 plus an assignment of all rights for insurance; Terrebone Motor Company, Inc. and named insurers for $100,000; Unisys Corp. and named insurer for $275,000; Williams–McWilliams Company, Inc. for $100,000 and an assignment of all rights for insurance.

The Third Supplemental Preliminary Settlement Agreement, document # 6074, was executed between the PSC and more than 200 compromising parties. This large group consists of ten main and third party defendants and their respective insurers solely in their capacities as insurers of the identified insured. *See Exhibit 1.* Compromising Parties contributed a total of $12,189,500 to the escrow account under similar terms as set out in the SSPSA. The subscription agreements are as follows: Exxon Corporation for $2,000,000; Shell entities for $2,000,000; CIBA–GEIGY Corp. and all insurers for %,500,000; Petrochemical Maintenance, Inc. and named insurers for $120,000; Western Auto Supply Company and the named insurers for $90,000; P & W Industries, Inc. and named insurers for $787,500; MagneTek and Universal Manufacturing solely for $275,000; Sears, Roebuck & Company and named insurers for $550,000; Affiliated FM Insurance Co. as insurer of Sears for $6,000; ERIC Reinsurance as insurer of Sears for $6,000; Sermatech International and named insurers for $175,000; Malone Service Company and named insurers for $250,000; Highland Insurance Company and other named insurers on an assignment of insurance by Boyce Machinery Corporation for $225,000; Zurich Insurance Co. as insurer of Brouillette's Lift Service, Inc. for $85,000; named insurers of Prairie Construction Company, Inc., James Corporation of Opelousas, and Central Manufacturing on an assignment of insurance for $65,000; The Home Insurance Company as insurer of Canal Refining on an assignment of insurance for $50,000; The Home Insurance Company as insurer of Reichhold Chemicals on an assignment of insurance for $5,000.

The Fourth Supplemental Preliminary Settlement Agreement, document #7b 6833, represents compromise between the PSC on one hand and 48 parties on the other, grouped together in nine subscription agreements. *See Exhibit 1.* The PSC deposited $4,195,000 into the Escrow account according to the following provisions: PMAG Products, Inc, its insurer, and insurers of K–Way Equipment Company for a net amount of $175,000 with reservation of rights by the PSC against American Insurance Company as insurer of K–Way; Entergy Louisiana, Inc. and named insurers for $2,375,000; United States Postal Service for $75,000; United States Fidelity and Guaranty Insurance solely as insurer of named insureds for $1,205,000; Meason Operating Company, Inc for $85,000; Carolina Casualty Insurance as insurer of Younger Brothers, Inc. for $5,000; Associated Aviation Underwriters as insurer of Louisiana Aircraft on an assignment for $175,000; named insurers of Paul Fournet Air Service, Inc. on an assignment for $100,000.

The Fifth Supplemental Preliminary Settlement Agreement, document #7b 7063, *in globo* subscription agreement represents the compromise between the PSC and almost 100 parties who have agreed to the settlement of all related claims in return for the payment of $20,500,000. This amount includes $6,000,000 plus interest paid by the Insurers of Avondale Industries in full satisfaction of a Guaranty given to the PSC in the *Preliminary Settlement Agreement. See Exhibit 1.* The remaining $14,500,000 accounting remains confidential as part of the agreement and releases the compromising parties from all current and future claims of liability made or that could be brought by the PSC or by any other compromising party to the *in globo* agreement. Thus, defendants Evans Cooperage, Port Allen Marine Services, Inc., and Iberville Motors are settling their controversies with the PSC and contract disputes with each party's particular set of insurers.

The Plaintiffs reserve all rights against the remaining, non-settling defendants and their "related parties" who may include insurance companies who are parties to this agreement. However, the PSC agrees not to proceed in any manner against any insurer who is also a party to the 5th SPSA. Arthur Gammons and his family waive all rights against parties to the 5thSPSA but without prejudice to the rights of the Gammons family to participate as members of the Class.

The four individual subscription agreements are Dirt Inc., Lamar Harrison for $20,000; Younger Brothers and named insurers for $450,000, and Younger Brothers waives it rights for indemnification from the named insurers; The Home Insurance Company as insurer of Combustion, Inc. and Arthur Gammons for $500,000; Louisiana Insurance Guaranty Association as guarantor of an insolvent insurer of Combustion, Inc. and Arthur Gammons for $250,000, out of which PSC will resolve claims against LIGA by CERCLA Plaintiffs.

### III. Law—Approval of Proposed Partial Settlements

■ Rule 23 of the Federal Rules of Civil Procedure requires court approval of any settlement entered into on behalf of a certified class. "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.Pro. 23(e). In deciding whether there is good cause to issue notice to the class and to proceed with a fairness hearing, the Court must determine that the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval. *In re Shell Oil Refinery,* 155 F.R.D. 552, 554 (E.D.La.1993)(and authorities cited therein).

■ The cardinal rule that a court must follow when considering final approval of a proposed class settlement is to ensure that the proposed settlement is "fair, reasonable, and adequate." *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207 (5th Cir.1981), *quoting Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). More particularly, the Fifth Circuit has described the Court's duty as ensur[ing] that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression. *Reed v. General Motors Corporation,* 703 F.2d 170 (5th Cir.1983), *quoting Pettway v. American Cast Iron Pipe Company,* 576 F.2d 1157, 1214 (5th Cir.1978). In determining whether the settlement meets this goal, a court must examine the following: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; (6) the opinions of the class counsel, class representatives, and absent class members. *Reed v. General Motors Corp.,* 703 F.2d at 172.

■ In the evaluation, a district court must "undertake an analysis of the facts and the law relevant to the proposed compromise and must support its conclusions by memorandum." *In re Corrugated,* 643 F.2d at 212,

*quoting Cotton v. Hinton,* 559 F.2d at 1330 (internal quotations omitted). A mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law will not suffice. *In re Corrugated,* 643 F.2d at 212, *citing Protective Committee v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968).

## IV. Analysis

### A. Preliminary Approval

In the case at bar, preliminary approval was given from the bench to each of the four proposed supplemental preliminary settlement agreements and in written orders that followed. *See Transcripts of the four hearings, Document numbers 4933, 5835, 6789, and 7004, and Orders granting Preliminary Approval to each agreement, Document numbers 5826, 6074, 6833, and 7063.* In support of preliminary approval, the Special Master and counsel for the settling parties testified at each hearing that the negotiations were arms-length and that the compromise represented the best efforts of all involved. The Court recognized that the agreements were the product of rigorous efforts on behalf roughly 450 settling parties and of endless negotiations on the part of liaison counsel and the Special Master, culminating in the Herculean effort to consummate the *in globo* settlement between PSC and the direct action insurers. Without question good cause was shown to issue notice to the Class and to proceed with a fairness hearing.

While this group of settlement agreements represents another milestone toward resolution of this marathon civil action, the task that remains will certainly require a formidable effort by the non-settling parties. The tort trial in September 1997 is projected to last ten weeks, and significant insurance coverage disputes are unresolved and may remain so until trial scheduled in early 1998. It is for this reason that this Court has decided to abandon its initial position to withhold distribution of funds until the resolution of litigation in all respects. Instead a partial distribution of funds to the Class at this time is appropriate. This particular fairness hearing represents an opportunity not only to examine the fruits of one and one-half years of negotiations, but also the time to start the process through which the Class may begin to reap the benefits of this decade-long brawl and compromise among the most skilled counsel in the country. After eleven years it is also time to focus on paying the legal bills, ending this saga, and moving ahead with life.

For good cause, then, this Court ordered notice of a fairness hearing to be disseminated to the Class at which the Court would consider giving formal approval to the four supplemental preliminary settlement agreements and begin the disbursement process.

### B. Notice

The Motion by Plaintiffs for Implementation of Partial Distribution Process asked that the Court schedule a fairness hearing to approve the Second, Third, Fourth and Fifth Supplemental Preliminary Settlement Agreements and to approve recommended maximum-cap reserves to be budgeted from the Settlement Fund. The purpose of earmarking reserves is to determine a dollar figure, the "Claimants' Fund," for disbursement to the Class. The Motion, document # 7072, was signed and filed into the record on March 7, 1996.

As a result, the Court ordered a fairness hearing to be held April 18, 1997, pursuant to Fed.R.Civ.Pro. 23(e), and directed that notice of the hearing be disseminated to all Class members who filed timely proofs of claim. Next, the Court ordered Special Master Juneau to submit his report and recommendations as to the nature and amount of any and all maximum-cap reserves. The Court ordered the PSC to include the Special Master's recommendations in the notice to the Class.

Notice to the Class was sent out March 10, 1997 and included *Important Notice of Hearing, Order for Implementation of Partial Distribution Process,* and *Newsletter Combustion, Inc. Litigation. See Exhibit 2.* Salient points of the *Important Notice of Hearing* include:

1) time, date, place of the hearing—9:30 a.m. April 18, 1997 at the Federal Courthouse in Baton Rouge, Louisiana;

2) the twofold purpose: to consider for final approval the Second, Third, Fourth, and Fifth Supplemental Preliminary Settlement Agreements, available for review by any Class member, and to begin the process for partial disbursement;

3) the amount of the proposed settlements, $32,451,150, and if approved, the total amount of the Settlement Fund inclusive of the settlements under consideration, $127,396,000;

4) the recommendations of the Special Master of the reserves to be budgeted from the Settlement Fund: a) 6% for Litigation costs; b) 6% for Class administrative costs; c) 36% Attorney's fees recoverable by the Plaintiffs' Steering Committee and independent attorneys of record who represent Class members; d) $500,000 plus accrued and future interest on the Settlement Fund for Class distribution costs and taxes; e) $2,000,000 Indemnity Fund in favor of the compromising parties approved in the first settlement agreement and held for a period of 13 months after the conclusion of the litigation in all respects, after which it will be disbursed at the Court's discretion for the benefit of the Class; and f) $1,000,000 PSC liability fund for protection of all claims against the PSC for a period of 13 months after the conclusion of the litigation in all respects after which it shall be disbursed at the Court's discretion for the benefit of the Class.

The notice also provided that the Court would incorporate into the approval of the settlements and reserves a provision that upon recommendation of CADA, the Court may order the intra reserve transfer of funds among certain of the reserves and may order payment of funds from the six reserves, where appropriate, without further notice to the Class. The movement of funds specifically would not adversely affect the Claimants' Fund and, if at all, only increase the amount of funds available for disbursement.

The notice further provided that upon final approval of the four remaining settlement agreements and proposed reserves and after the disposition of any appeals, the Court will order the Special Master to prepare and submit to the Court for preliminary approval a plan of distribution of the Claimants' Fund. After appropriate notice to each member of the Class, the proposed plan will be presented to the Class for a hearing on August 15, 1997.

Finally, the notice provided a procedure through which any Class member could review and object to any settlement agreement or any recommendation of the Special Master. In this regard, as discussed, *infra*, the Court offered to anyone in attendance at the hearing the opportunity to question every witness during every step of the hearing.

## C. Fairness, Reasonableness, and Adequacy

In support of the fairness, reasonableness, and adequacy of the proposed settlements, the PSC offered into evidence all preliminary settlement agreements to date and all documents generated in connection with the Second, Third, Fourth, and Fifth Supplemental Preliminary Settlement Agreements. Included in this submission was the notice to the Class, affidavits by PSC members and Class representatives, the Clerk of Court's official attorneys' list and docket sheet, listing 4,092 discovery and deposition documents, approximately 6,600 pleadings and 1600 motions filed in federal court, 473 attorneys of record and 60 attorneys registered *pro hac vice* representing about 2335 party-defendants.

This Court has carefully reviewed the submissions in light of the factors suggested in *Reed v. General Motors Corp., supra,* 703 F.2d at 172, and bases the following findings on that review as well as the full record and this Court's knowledge of the case.

## D. *Reed* factors

### 1) Existence of Fraud or Collusion

There is nothing before the Court to indicate that fraud or collusion is involved in any way in the confection of the settlement agreements. The Court has closely monitored the negotiations and is of the opinion that all counsel have tenaciously and vigorously represented their clients' interests throughout this litigation. Liaison Counsel

for the Plaintiffs and for the Insurers both testified that the negotiations were arms-length, and without collusion. *Transcript Ap. 18 hearing, pp. 30:20, 43:12, 54:12.* Further, testimony was presented that the matter of attorneys' fees was not negotiated in conjunction with the settlement agreements but was left for separate determination by the Court. *Transcript Ap. 18 hearing, pp. 35:1-12; see In re Ford Motor Co. Bronco II Lit.,* 1995 WL 222177, *4 (E.D.La.1995) ("Separate negotiation of the class settlement before an agreement on fees in generally preferable to avoid conflicts of interest between the attorneys and the class.").

### 2) Complexity, Expense and Duration of the Case

Without question, this case is seriously complex. Testimony from liaison counsel attests to the complexity of this case. *See testimony of Calvin C. Fayard, Transcript Ap. 18, pp. 27:21-39:17, and Ralph Hubbard, pp. 40:16-44:18.* The sheer volume of relevant material alone supports this finding. The alleged liability in this litigation extends for thirty years, beginning in the 1960s. Records kept at the site from the beginning of the recycling business until 1977 were burned in a fire at the site, so the majority of the evidence had to be gathered through reliance on memories of site workers, truck drivers, residents of Livingston Parish, and employees at defendants' facilities employed during those years. Enormous resources have been spent just locating these witnesses. Counsel testified that if it were possible to gather all the files from the PSC's and defendants' offices together in the Courtroom, the entire room would be filled. It is the estimate of this Court that paper would flow into the Courthouse corridors as well.

More than 2,300 party-defendants are in the record of the Clerk of Court. About 530 attorneys appeared before the Court to file and argue motions, and countless teams of attorneys provided support in the form of research and writing for each one that actually appeared. Cases of this magnitude that have been vigorously litigated every step of the way, for eleven years, are an enormous

financial and psychological burden on all parties involved. This Court has repeatedly heard from the parties that at least one significant factor in the settlement process was the opportunity to "stop the bleeding" for the client.

Changes in the applicable law of the State of Louisiana over the 30 year period create major problems in Phase III preparation, as was the case as both sides struggled mightily to prepare a joint submission on the jury interrogatories, only to gain a reprieve with the trial continuance. It is the opinion of this Court that this case was and continues to be sufficiently complex, that eleven years has taken its toll financially and emotionally on all parties, that the prospect of a trial lasting months and even years if these parties remain in the litigation all weigh heavily in favor of finding that partial resolution by settlement is a reasonable and equitable option for all parties involved.

### 3) Stage of the Proceedings

The tort trial was originally scheduled for April 1, 1997, a date that this Court had etched in stone for three years since the inception of the Case Management and Scheduling Order in 1994. At that time, the case was already in its 7th year of development through rigorous motion practice in state court prior to being removed to federal court. Each of the settlement agreements at issue was confected well after discovery deadlines for that particular group of settling parties. In fact, the parties to the 5th SPSA were busily preparing jury interrogatories and when their settlement was completed. Liaison counsel testified that all parties were fully aware of the strengths and weaknesses of each side's case. *Transcript Ap. 18, pp. 33:13, 41:15, 51:10.* All parties were in an excellent position to assess their respective positions, and this Court has a sound basis to judge whether the settlement is fair and reasonable.

### 4) Probability of Plaintiffs' Success on the Merits

It is this Court's opinion, even after having come within two weeks of trial, that it would be pure speculation to predict with any de-

gree of certainty the probability of the Plaintiffs' success at trial. A primary reason for the uncertainty is the extreme volatility of the issues presented in this case. The subject matter of the case, allegations of dumping of hazardous materials into unlined pits, burning or burying drums containing carcinogens at the site, and other such egregious activities, are extremely sensitive in this State due to the general perception that Louisiana and its citizens have long been victims of this type of activity. The seriousness of exposure to just two of the hazardous chemicals found at the Combustion site—benzene and toluene—has been brought to the attention of the public by the extreme safety precautions taken by the State after a recent toluene spill along Interstate 10 and a benzene leak from a barge on the Mississippi River.

It is certainly possible that the jury could find in favor of the Plaintiffs and could impose a very heavy burden for damages on defendants who are found to have caused the damages. If the jury finds liability and then considers damages, the probability is high that the damages awarded to Plaintiffs will be large. It is also not lost on the Court that counsel for the compromising parties, some of the most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a jury trial was in the best interest of their clients. This Court must accord due respect to the judgment of counsel.

On the other hand, Plaintiffs will have very serious legal and evidentiary hurdles to meet in order to get their case to the jury. Plaintiffs' absolute and strict liability theories based on ultrahazardous activities pursuant to La.Civ.Code art. 2315, *garde* under La.Civ. Code art. 2317, and product liability under La.Civ.Code art. 2315, are being closely studied by the Court. Summary Judgment motions are pending on these allegations. Suffice it to say that the Plaintiffs acknowledge the difficulty in carrying this burden of proof.

Even without the difficulties with their legal theories, Plaintiffs will have substantial difficulties of proof. The site owners have no documentary evidence of the activities at the site prior to 1977. Until the site was closed, there was no regular testing of the air, water, and earth surrounding the site, making problematic the proof of the nature and extent of offsite migration of the chemicals located at the site. The sheer number of chemicals found at the site coupled with the paltry few studies available of the harmful effects of these chemicals when mixed will make proving causation difficult. Without documented evidence regarding offsite migration to prove a causal link between the hazardous chemicals and the individual plaintiff's injury will be difficult.

The question of whether Plaintiffs will be able to carry this burden at trial will be decided by the jury. Neither this Court, Plaintiffs, nor defendants can possibly anticipate what a jury will actually find. These questions are sufficiently serious to justify settlement.

### 5) Range of Possible Recovery

Attached to the Preliminary Settlement Agreement, document # 5826, as Exhibit L is the PSC's evaluation of the optimum value of the plaintiff class' claims. Approximately 1,000 claimants have asserted claims for major injuries, including death, cancer, and leukemia. The PSC evaluates these claims as worth an optimum average of $500,000 per claim. Approximately 4,500 claimants have asserted claims for lesser injuries caused by exposure within two miles of the Combustion, Inc. site. The PSC assigns an optimum average value of $50,000 to each of these claims. Finally, approximately 4,500 claimants have asserted claims for lesser injuries caused by exposure greater than 2 miles from the site. The PSC assigns these an optimum average value of $10,000 per claim. The sum total of plaintiffs' assigned values is $770,000,000.

After a thorough review of the PSC's submission, this Court finds that the Plaintiffs' evaluation of the upper range of possible recovery is reasonable. If the PSC is able to prove at trial every element of their claims, total recovery by the Class could well amount to $770 million. It is an accepted practice for plaintiffs' counsels' evaluation of their case to be geared toward its optimum value. However, in light of the substantial burden of

proof and the significant difficulties associated with success on the merits, a similar possibility exists that recovery by class members could be nothing. These extremes highlight reasonable settlements in all cases. This case is no exception.

The proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case in view of what might happen at trial. The PSC has demonstrated that this proposed settlement meets that burden.

### 6) Opinions of Class Counsel, Class Representatives, and Absent Class Members

The opinions of Class counsel, Class representatives and the Special Master unanimously favor the settlements as proposed. *Transcript Ap. 18, pp. 39:18, 40:16–46:22, 56:25.* Members of the Plaintiffs' Steering Committee and Class representatives have filed affidavits into the record recommending approval of the settlements as proposed.

With regard to the Due Process requirement that an absent party be given an opportunity to be heard, this Court is not aware of any class member who was in any way prevented, deterred, or discouraged from presenting objections to the Court, either in writing or by appearance. As noted below, this Court is not aware of any objection filed or brought to the attention of any member of the PSC or any other Plaintiffs' counsel as to the fairness, reasonableness, and adequacy of these four proposed settlement agreements.

■ The "Important Notice of Hearing" was mailed to all Plaintiffs' counsel of record as well as all class members who have completed Proof of Claim forms. Notice was also published in two local newspapers, the Baton Rouge Morning Advocate and the Denham Springs News on March 13, 1997. *See Exhibit FH3–J–2 in documents presented at Ap. 18 hearing.* This Court finds that the direct mailings as well as publication in two local newspapers is reasonable and sufficient to satisfy the Due Process requirement of notice, as well as all notice requirements of Fed.R.Civ.Pro. 23.

### E. Objections to the Proposed Settlements

Not one Class member objected in writing to the proposed settlements, and no objection was raised orally at the hearing. At the start of the April 18th hearing, the Court invited Class representatives to join counsel for compromising parties inside the well to view the exhibits and participate in the hearing. *Transcript at p. 18.* The Court provided Class representatives and Class members in attendance the opportunity to question each witness and to ask questions throughout the seven-hour hearing. No questions were raised regarding this first phase, indicating to the Court that the Class members present regarded the proposed settlements to be fair, reasonable, and adequate.

### F. Conclusion—Phase I

■ For the foregoing reasons, this Court finds that the Second Supplemental Preliminary Settlement Agreement, the Third Supplemental Preliminary Settlement Agreement, the Fourth Supplemental Preliminary Settlement Agreement, and the Fifth Supplemental Settlement Agreement are fair, reasonable, and adequate as proposed. These settlements are in the best interest of the Class, and there is no dissent among Class members to the proposal. The result of this finding is that the total sum of approximately $32,451,150 will be added to the Settlement Fund, bringing the total principal amount of the Settlement Fund on hand for consideration in Phase II of this Memorandum to be approximately $127,396,000.

### V. Partial Disbursement—Phase II

### A. Overview

The focus of the second phase of the hearing is partial disbursement to the Class. It is the intent of the Court to set up the process so that each payment to a Class member is issued free and clear of Class expenses to date, such as costs of litigation, costs unique to class actions, and attorneys' fees. From the total principal on hand, referred to as the Settlement Fund, the Court will direct the Special Master to deduct such expenses as are approved as a result of the

April 18, 1997 hearing and to initiate the process of disbursing the remaining amount to the Class this fall. The amount to be disbursed is heretofore referred to as the Claimants' Fund.

To this end, the Court ordered the Special Master to recommend categories of "reserves" for the purpose of budgeting sufficient funds to cover these expenses. After hearing testimony from the Special Master, experts, liaison counsel, and the court-appointed-disbursing-agent (CADA) regarding the purpose and amount of the reserves, and for the reasons that follows, the Court adopts completely the Special Master's recommendations:

1) Indemnity Fund in favor of compromising parties of $2,000,000, held for a period of 13 months after the conclusion of litigation in all respects, after which it will be disbursed at the discretion of the Court for the benefit of the Class;

2) PSC liability fund of $1,000,000, held for a period of 13 months after the conclusion of litigation in all respects, after which it will be disbursed at the discretion of the Court for the benefit of the Class;

3) Class distribution costs and taxes of $500,000 plus accrued and future interest on the Settlement Fund;

4) Litigation costs of 6%;

5) Class administration costs of 6%; and

6) Attorneys' fees 36%.

Further, the Court adopts the following stipulations regarding management of the reserves.

1) The maximum reserves and these stipulations for management of the reserves shall apply to the principal Settlement Fund on hand as of March 7, 1997 and all accrued interest on this amount to date and thereafter.

2) Any payment or withdrawal from any of the reserves shall be made by Order of the Court, and then only upon recommendation of the court-appointed-disbursing-agent (CADA) and in accordance with the relevant stipulation stated herein. The request shall be presented to CADA with the appropriate documentation. CADA shall review, summarize, and categorize each request and make its recommendation accordingly to the Court, attaching the request, documentation, and certificate of review. The Court may then issue a formal order or other action the court deems appropriate and in the best interest of the Class.

3) Withdrawal of funds and intra fund transfers as specified in 2) shall be allowed without further notice to the Class.

4) Intra fund transfers shall be allowed exclusively among the Class administration reserve, the litigation reserve, and the Class distribution reserve.

5) Intra fund transfers shall not diminish the amount of the Claimants' Fund.

6) The amount of the attorneys' fee reserve, as designated by this Judgment shall not be enhanced by any funds from the other maximum reserves or the Claimants' Fund. The Court shall only allow payments out of and intra reserve transfers from the attorney's fee reserve but only after following the procedure stipulated herein and only after notice to all plaintiffs' counsel and a hearing on the matter.

7) Request for payment, withdrawal, or transfer of funds from the Indemnity Fund must be made by motion and served on all plaintiffs' attorneys of record and through Liaison Counsel, and on all settling parties who shall be given the opportunity to be heard by the Court before any action is taken on the matter.

8) Request for payment, withdrawal, or transfer of funds from the PSC Liability reserve must be made by motion and served on all attorneys' of record, or on a Court-designated plaintiffs' Liaison Counsel, and these parties shall be given an opportunity to be heard by the Court before any action is taken on the request.

9) The purpose of setting these reserves at maximum amounts is to determine a minimum amount of funds available for immediate disbursement to the Class. Any amount remaining in any of the reserves after payment of the appropriate expenses, after any necessary transfers, and after the appropriate lapse of time shall be used

for the benefit of the Class at the discretion of the Court.

## B. Reserves

### 1. Indemnity and Liability Reserves

The Special Master recommended an indemnity fund of $2,000,000 and a liability fund of $1,000,000 for the settling parties and the Plaintiffs' Steering Committee respectively. The settling parties' indemnity fund was set up in the original *Preliminary Settlement Agreement* that was formally approved by the Court on February 7, 1996. *See Written Reasons, document #4160.* Each subsequent group of settling parties adopted the wording of that provision and became protected parties as if each had been a party to the original agreement.

The liability fund for the PSC was recommended by the Special Master in the same vein as the settling defendants' indemnity fund. Reserves similar to these are common in class actions such as the instant case. Both funds are to be held "for a period of 13 months after the conclusion of the litigation in all respects," and any remaining funds are to be used for the benefit of the Class at the discretion of the Court. *See Important Notice of Hearing,* exhibit 2, p. 3, # 9 and pp. 2–3 # 7e, f. The funds in these two reserves are not available for intra reserve transfer prior to the end of the required 13 months after the end of litigation in all respects. *Transcript April 18, p. 171.* At that time the remaining funds shall be used at the Court's discretion for the benefit of the Class. Sufficient notice shall be given to the affected parties if the Court receives a request for use of funds in either reserve.

█ It is the opinion of this Court that these reserves are necessary, are reasonable as proposed, and are sufficient to cover indemnity and liability contingencies.

### 2. Litigation, Class Administration, and Class Distribution Reserves

The Special Master has proposed a 6% maximum-cap reserve each for litigation costs and Class administration costs, and $500,000 plus accrued and future interest on the Settlement Fund for Class distribution costs. Testimony at the hearing established that litigation costs includes the typical costs of maintaining a lawsuit, such as expert witness' fees, filing costs, and staff attorney costs. Class administration costs are those that are unique to a class action and would not occur in a standard lawsuit, such as the costs of fairness hearings, notices to the Class, newsletters to the Class, and proof of claims offices. The distribution costs are those expenses associated with setting up, managing, and maintaining the disbursement office for the Class. For example, to create the disbursement algorithm, the Special Master has hired medical experts to evaluate each claim involving medical injury. Disbursement costs also include the costs of setting up special accounts for interdicts and minors. *Transcript April 18, testimony Hugh Sibley, pp. 154–176 and Daniel Clavier–CADA, pp. 179–188.*

The Special Master's recommendations are based on his experience as an attorney and mediator and on the opinions of both Mr. Sibley, the financial specialist on the PSC, and Mr. Clavier, representing CADA. In the event that one reserve is under-funded and another over-funded, the Court shall have the authority to transfer needed funds from the excess to the under-funded reserve, but only after the request is reviewed by CADA, recommended to the Court, and approved by formal Order of the Court.

█ This Court accepts the opinions of the Special Master, the PSC financial specialist, and CADA regarding the sufficiency of these more technical reserves and is satisfied that the amount of each of these reserves is reasonable as proposed.

### 3. Attorneys' Fees

The Court is asked to consider the Special Master's recommendation of a maximum-cap reserve of 36% for attorneys' fees. The Court has carefully reviewed the testimony presented at the hearing, as well as the case law in this and other Circuits. Based on this review, and the Court's intimate knowledge of the unique nature of this case and the extremely sophisticated and creative compromises that have resulted in closure for hun-

dreds of defendants and for the Class, and for the reasons below, the Court finds that a maximum reserve of 36% is reasonable.

### a) Methodology

 As a general rule a court may not award attorneys' fees to a prevailing party unless expressly authorized by statute. *Alyeska Pipeline Co. v. Wilderness Socy,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Two major exceptions to this rule are the power of the court to award fees against a party who has acted in bad faith and to award fees to counsel who has created a benefit for third parties, such as a common fund for the benefit of the class, where the fee award and expenses are taken out of the common fund created. *Id.* A district court may use its discretionary powers to determine what is a reasonable and fair award from a common fund, where the fund itself represents the benchmark from which reasonableness is measured. 3 Herbert Newberg, Alba Conte, *Newberg on Class Actions, Third Edition,* § 14.03 (1992) (Hereinafter Newberg at § ——).

 It is important for class members to understand what their obligations are to class counsel for costs and fees. *Newberg* at § 1401. When the class action successfully recovers a fund for the benefit of a class, it is long settled that the attorneys who created that class recovery are entitled to be reimbursed from the common fund for their reasonable litigation expenses, including reasonable attorneys' fees. *Newberg* § 14.02; *Skelton v. General Motors Corp.,* 860 F.2d 250, 252 (7th Cir.1988)("similar to the way plaintiff's attorney may be compensated by a contingency fee, a plaintiff class pays its attorneys by sharing its recovery with them."). Class counsel are not authorized to bill the class directly for their services but must petition the court for an award of fees reasonable under the circumstances and in light of the monetary benefit created for the class. *Newberg* at § 14.02.

### i) Percentage of Fund

The amount of a common fund fee award is calculated in several ways. Historically, a common fee award was determined through an exercise of the court's discretion based on a standard of reasonableness under the circumstances. *See Central Railroad & Banking Co. of Georgia v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). As courts acquired more experience in awarding fees from common funds, fee patterns began to reflect a percentage award of the common fund recovered. *In re: Quantum Health Resources,* 962 F.Supp. 1254, 1256 (C.D.Cal.) (1997) (and authorities cited therein).

 The rationale behind awarding a percentage of the fund to counsel in common fund cases is the same as that which justifies permitting contingency fee arrangements in general. *Id.* The underlying premise is the existence of risk—the contingent risk of nonpayment. Thus, for a contingent fee to be appropriate, there must be a realistic risk of nonrecovery. *Id.* The size of the contingent fee is designed to be greater than the reasonable value of the services in the individual case, i.e., hours worked times hourly rate. The higher payment due under a contingency fee reflects the fact that the lawyer will realize no return for his investment of time and office expenses in the cases he loses. F. MacKinnon, *Contingency Fees for Legal Services,* at p. 28 (1964). Because payment is contingent upon receiving a favorable result for the class, an attorney should be compensated both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case. 1 Conte, *Attorney Fee Awards, supra,* § 1.09.

The Ninth Circuit has adopted a benchmark of 25% in percentage of fund cases and adjusts this figure upward where the particular circumstances are extraordinary, or downward where, for example, recovery is a certainty. *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 273 (9th Cir.1989); *In re Quantum Health Resources, Inc.,* 962 F.Supp. 1254, 1257; *see also In re Rio Hair Naturalizer Products Liability Litigation,* 1996 WL 780512, p. *14 (E.D.Mich.1996) (fee awards in common fund cases are calculated as a percentage of the fund created, typically ranging from 20–50 percent of the fund); *Wise v. Popoff,* 835 F.Supp. 977, 979

(E.D.Mich.1993) (same); *In re Cincinnati Gas & Electric Securities Lit.,* 643 F.Supp. 148, 150 (S.D.Ohio 1986) (award of 43.3% of fees exclusive of costs reasonable under the circumstances).

Where a group of attorneys is involved, some courts have approved an aggregate percentage amount for the group as a whole with instructions to the attorneys to work out individual awards among themselves. *See Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir.1992) (where the award of an aggregate fee was approved by the Fifth Circuit); *In re Shell Oil Refinery,* 155 F.R.D. 552, 568 (E.D.La.1993) (attorney fee aggregate requested and approved). This Court is mindful that the Fifth Circuit stated its approval of leaving the exact apportionment of individual fees from the percentage or aggregate award to the attorneys themselves. *Longden v. Sunderman,* 979 F.2d 1095, 1101 (5th Cir. 1992).

No general rule can be articulated as to what is a reasonable percentage of a common fund. Usually 50 percent of the fund is the upper limit on a reasonable fee award from a common fund to assure that fees do not consume a disproportionate part of the recovery obtained for the class, though somewhat larger percentages are not unprecedented. *Camden I Condominium Assn. v. Dunkle,* 946 F.2d 768 (11th Cir.1991); 1 Conte, *Attorney Fee Awards,* § 2.08 text and n. 131. More specifically, district courts in the Fifth Circuit have awarded percentages of approximately one-third contingency fee. *Kleinman v. Harris,* No. 3:89–CV–1869–X (N.D.Tex. June 21, 1993) (approving fee of approximately one-third of benefit achieved); *In re: Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La. 1993) (aggregate of ⅓ to Plaintiffs' Committee); *In re: Granada Partnerships Sec. Lt.,* MDL No. 837 (S.D.Tex. Oct. 16, 1992) (fees in the amount of 30% awarded under a pure percentage of recovery approach); *In re Lomas Fin. Corp. Sec. Litig.,* No. CA–3–89–1962–G (N.D.Tex. Jan. 28, 1992) (approving fee of almost one-third of benefit); *Rywell v. Healthvest,* No. CA3–89–2394–H (N.D.Tex. Dec. 3, 1991) (award fee of 30% of benefit); *Teichler v. DSC Communications Corp.,* No. CA3–85–2005–T (N.D.Tex. Oct. 22, 1990)

(plaintiffs' attorneys awarded one-third of benefit); *Finkel v. Docutel/Olivetta Corp,* No. CA3–84–0566–T (N.D.Tex. Feb. 23, 1990) (award of one-third of settlement fund).

### ii) Lodestar–risk Multiplier

A second method for awarding fees in a common fund case, the lodestar-risk multiplier, grew out of the court's concern that a percentage approach resulted in overcompensation for attorneys, *Harman v. Lyphomed, Incorporated,* 945 F.2d 969, 974 (7th Cir. 1991), particularly in securities class actions involving little or no risk in obtaining a relatively quick and substantial settlement amount. *In re: Quantum Health Resources,* 962 F.Supp. 1254, 1256 (1997) The "lodestar" is obtained by multiplying the total attorney-hours on a case by reasonable hourly rate (or rates). The court would then exercise its discretion to determine the appropriate factor, if any to enhance or reduce the lodestar to reflect the risk of success involved in the matter. *See Lindy Brothers Builders v. American Radiator & Standard Sanitary Corp (Lindy I and Lindy II),* 487 F.2d 161 (3rd Cir.1973) (*Lindy I*) and 540 F.2d 102 (3rd Cir.1976) (en banc) (*Lindy II*).

A risk multiplier is not merely available in a common fund case but can be mandated if the court finds that counsel had no sure source of compensation. *Continental Illinois Securities Litigation,* 962 F.2d 566, 569 (9th Cir.1992) (Posner, J.). The Seventh Circuit has held that risk with regard to the probability of success in the particular type of litigation must be assessed *ex ante,* that is, as viewed from the outset of the case. *Harman,* 945 F.2d at 976. The use of the multiplier assumes that no matter how many hours are invested, there was, at the outset, the possibility of no recovery. The Fifth Circuit appears to evaluate risk of success throughout the course of the litigation. *See In re Shell Oil Refinery, Shell Oil Refinery,* 155 F.R.D. 552 (E.D.La.1993) (risk discussed at outset of the litigation and with regard to success at trial).

Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied. *In re Shell Oil Refinery,* 155 F.R.D. 552, 573

(E.D.La.1993) (applying risk multiplier of 3 to 3.5) (and cases cited at note 55); *In re Corrugated Container Antitrust Litigation,* 1983 WL 1872 (S.D.Tex.1983) (awarding multipliers up to 4.0); *Rievman v. Burlington N. Ry. Co.,* 118 F.R.D. 29 (S.D.N.Y. 1987) (3.26 for complexity, risks, and benefit to class); *Mister v. Illinois Central Gulf Railroad Co,* No 81–3006 (S.D.Ill. Aug. 5, 1993) (where the court noted that if ever there was a case for the maximum multiplier to be used, it was this common fund case because of the undesirability of the case, the exceptional result, the contingent nature of the fee, and the public policy advanced); *Newberg* at § 14.03 (and authorities cited at note 20). A large common fund award may warrant an even larger multiplier. *See e.g. In re Beverly Hills Fire Lit.,* 639 F.Supp. 915 (E.D.Ky. 1986) (personal injury class action; multiplier of 5 for lead counsel for contingency and superior trial skills); *Wilson v. Bank of Am. Nat'l Trust & Savs. Ass'n,* No 643872 (Cal. Sup. Ct. Aug 16, 1982) (illegal use of escrow funds by lender for profit; noncontinent hourly rates of up to $150/hour and a multiplier of up to 10 times the hourly rate).

The Third Circuit engaged a special task force to address some of the problems that circuit was facing with court-awarded attorneys' fees. With regard to lodestar-risk multiplier, the task force reported that some factors which enhance the multiplier are: 1) the risk of losing; 2) the result obtained; 3) the delay in obtaining attorneys' fees; and 4) the petitioning attorney's contribution to a prompt or delayed resolution of the action. *Third Circuit Task Force on Court-awarded Attorneys' Fees,* (October 8, 1985) reprinted in 108 F.R.D. 237, 264 (1985).

### iii) Fifth Circuit Methodology

The law of the Fifth Circuit as to which of the two methods should be employed in common fund cases is at best unclear. *Newberg,* § 3s–24. In 1974, the Fifth Circuit set forth 12 potential factors for determination of a reasonable fee award in a statutory award case, or "fee-shifting" case, where the district court had arrived at a fee award under the lodestar approach but apparently without sufficient justification. *Johnson v. Georgia*

*Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974). The Fifth Circuit recommended twelve factors for the district court to use as it reconsidered the award: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitation imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys involved; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases.

The Fifth Circuit soon extended the applicability of the *Johnson* factors to cases determining attorneys' fees from a settlement fund where the attorney had entered into a contingency fee contract with the plaintiff beforehand. *See Hoffert v. General Motors Corp.,* 656 F.2d 161 (5th Cir.1981). *Hoffert* was a products liability suit, where the district court was asked to approve a settlement between the parties which included a contingency fee of ⅓ of the total settlement for the plaintiffs' attorney. The district court approved the settlement but lowered the contingency contract to ⅕, an amount it considered "reasonable," after using the *Johnson* factors. *See also In re: Catfish Litigation,* 939 F.Supp. 493, 501–03 (N.D.Ms. 1994) (where the district court awarded fees in a common fund case by percentage of fund and determined reasonableness by the use of the *Johnson* factors).

The Fifth Circuit continued this blending of approaches for fee determinations in an effort to combine the best features of the lodestar, percentage, and *Johnson* factors. 1 Conte, *Attorney Fees Awards, supra,* § 2.04 (and cases cited at note 69). Apparently the terminology blended as well. The meaning of the term "lodestar" grew to incorporate the actual calculation of the lodestar *plus* evaluation and adjustment of the lodestar via application of the *Johnson* factors. For example, in *Longden v. Sunderman,* 979 F.2d

1095 (5th Cir.1992), the Fifth Circuit stated that "[t]his circuit utilizes the 'lodestar method' to calculate attorneys' fees." *Id.* at 1099. The Court proceeded to explain that "[t]he lodestar is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. The court then adjusts the lodestar upward or downward depending on the respective weights of the twelve factors set forth in [*Johnson* ]." *Id.* Interestingly, the "risk multiplier" is not considered separately in the Fifth Circuit but apparently included with the *Johnson* factor evaluation. *See Longden v. Sunderman*, 979 F.2d 1095, 1099 (5th Cir.1992); *In re Shell Oil Refinery*, 155 F.R.D. at 572 (discussion of risk incorporated in the "undesirability of the case.").

The *Longden* district court mirrored the confusion that exists over fee award terminology and methodology in this circuit by stating that "[t]he question in the circuit is as to whether or not a percentage fee will stand up or is the circuit still controlled by the *Johnson* factors [apparently meaning lodestar with *Johnson* factors]. I'm going to address it both ways." *Id.*

■■■■■ Even though it is apparent that the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered. If a district court has articulated and clearly utilized the *Johnson* framework as the basis of its analysis, "we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *Louisiana Power & Light v. Kellstrom*, 50 F.3d 319, 331 (5th Cir.1995).

■■■■■ It is the opinion of this Court that in common fund cases such as the instant case, Fifth Circuit precedent requires a district court only to justify its award of attorneys' fees within the framework of the *Johnson* factors regardless of whether the award is determined by the lodestar or percentage of fund method. Further, a district court may exercise its discretion as to whether the fee evaluation more reasonably fits into a percentage of fund or into a lodestar

calculation as long as either selection is supported by *Johnson* factor analysis.

The review of district court opinions in this circuit, as was done in *In re Prudential–Bache Energy Income Part., Securities Litigation,* 1994 WL 150742 (E.D.La.1994), indicates that the district courts within this circuit utilize the percentage of the fund method. *See also In re: Catfish Litigation,* 939 F.Supp. 493 (N.D.Ms. 1996) (citing problems with the application of the lodestar method due to the circumstances of the case, so adopting the percentage of fund validated with the *Johnson* factors). And while the *Johnson* factors seem to have become synonymous in this circuit with the lodestar calculation, the *Johnson* court's rationale for developing the factors is simply for justification of a fee award. The Fifth Circuit in *Johnson* stated,

> the judgment [of the District Court] does not elucidate the factors which contributed to the [fee amount] and upon which [the fee] is based.

*Id.* at 717.

Further, the Fifth Circuit's instruction to the district court on remand indicates that the factors are to be used as the *basis* for validation of fees regardless of the methodology used to realize a fee award:

> By remand of this case, we voice no observation or intimation at the correctness of the amount awarded. We merely vacate the award and remand for reconsideration in light of this opinion and for entry of an order <u>reflecting a reasonable fee which reflects the considerations which led to it.</u>

*Johnson v. Georgia Highway Express,* 488 F.2d at 720 (underline added).

### b) Analysis—methodology

In the case at bar, the Special Master recommends that this Court approve a maximum-cap reserve for attorneys' fees of 36% of the Settlement Fund as the upper limit for the fee award. This percentage of the fund represents an aggregate for all members of the PSC and for independent counsel who represent members of the Class.

■■■■■ This Court agrees that the percentage of fund is the most appropriate method-

ology for determining the fee award under the circumstances of this case. The duration of this case, the myriad of tasks at different billing rates that have been performed by the attorneys' whose work is reflected in the lodestar, the size of the plaintiff attorney pool—roughly 100—would, as a practical matter, require this Court to enlist professional accounting services to compute fees using the lodestar method. Also, the Court recognizes the benefit of awarding the fee in aggregate as is recommended by the Special Master and CADA, leaving the individual assignments to be worked out privately among the Plaintiffs' attorneys.

The purpose of the reserve at this point is strictly to budget an aggregate amount to satisfy fees for all attorneys who are either committee members or independent counsel of record representing plaintiffs in this action as of March 7, 1997. The Court is not asked to review individual fee petitions, only to earmark a reasonable reserve from which to gain Class approval.

 Regarding the actual percentage of 36%, Plaintiffs' Counsel offered evidence of the reasonableness of this amount through testimony of the plaintiffs' liaison counsel, the Special Master, PSC staff members, and CADA. After hearing hours of testimony, and after careful analysis within the framework of the *Johnson* factors discussed *infra,* this Court finds that 36% is the most reasonable percentage.

### c) Application of *Johnson* Factors

### i) Time and Labor Required

This litigation is eleven years old. The same group of ten plaintiffs' attorneys, the PSC, has managed and funded this case for its entirety. Plaintiffs' Liaison Counsel testified that teams of members were set up in committee members' offices to handle major parts of the litigation, such as proof of claims, depositions, discovery, motion practice, trial preparation, settlement, and automation.

In the course of these eleven years, there have been roughly 160 complaints filed, 1140 answers, 1922 motions, with almost 1000 memoranda in support of or in opposition to these motions, 285 depositions (not including depositions taken in a related action that was litigated for several years before being consolidated with *Combustion* ), 90 hearings, at least one oral argument per month since the case was removed to federal court, and endless numbers of settlement conferences. There have been three fairness hearings, the first one lasting one week, and the other two lasting approximately one day each. There has been one *Daubert* hearing lasting a total of two weeks.

It is fair to conclude that this case required and continues to require an enormous amount of dedicated time and labor. Eleven years is an extraordinary length of time for continuous litigation, but such was the case in *Combustion* because of the manner in which this case developed. First the plaintiffs sued the main defendants. Six years later third party defendants were brought in, and a year later all the insurers of all defendants and third party defendants were sued. Each wave of claims in itself represents a sizeable lawsuit, and it is only after considerable effort on both sides that the parties arrive at a position to negotiate settlement. Judge Livaudais so aptly described a similar situation in *Prudential—Bache Energy Income Part. Securities Litigation,* 815 F.Supp. 177 (E.D.La.1993):

> [t]he voluminous record in this case is the result of a veritable deluge of filings, a hurricane of paperwork. . . .

*Id* at 184.

The PSC submitted a total of 51,121 hours of work, the result of individual submissions by each committee member and several partners in his or her respective firms. This total does not include the hours of work that remains to be submitted by the independent attorneys representing Class members, whose hours also qualify as part of the lodestar number.

In addition, this matter is scheduled for trial in September 29, 1997. Trial time is estimated to be ten weeks. A mountain of work remains. Preparation and trial time could easily run into the millions of dollars for both sides.

When coupled with the discussion, *supra,* under the second prong of the *Reed* factors,

"complexity, expense, and duration of the case," the Court comfortably concludes that this particular factor is an important one in support of a substantial attorney award.

### ii) Novelty and Difficulty of the Questions Involved

This factor is addressed, in part, with the discussion above regarding the fourth *Reed* factor, 'Probability of Plaintiffs' success on the merits.'

In addition, the technical aspects of this case are particularly complex. For example, the Court heard two weeks of testimony at the *Daubert* hearing regarding just one of the plaintiffs' proposed expert witnesses. Thirty-three expert reports were filed by both sides on technical issues alone. Subsequent motions for *Daubert* hearings are currently filed and continued without date.

The trial plan is an original creation designed with thoughts of judicial efficiency and economies of pocketbooks but still within the framework of relevant Fifth Circuit decisions on other class actions. Specifically, the Case Management Order provides for a trial on issues common to the site and specific to each defendant, i.e., dates, events, volumes shipped, issues that will not vary with regard to the Class and that once determined will be *res judicata* for the remainder of the litigation. Then the Court will hold mini trials involving groups of plaintiffs until all the Claimants have been individually considered or until the remaining tort parties settle. The prospect of trying the entire case—literally years of litigation—remains daunting and astronomically expensive for all parties involved.

Until this last round of settlements, the trial involving the insurers and the direct action Plaintiffs was scheduled to begin after the conclusion of the tort trial. The issues of whether the 150 insurers would have to participate in the Phase II tort trial and whether the parties in the insurance trial would automatically be bound by the common issues of fact determined in Phase II remained undecided. The Fifth Supplemental Preliminary Settlement Agreement currently before the Court has precluded the necessity of the Court's ruling on these matters.

As the Court observed in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D.La.1993), there is much uncharted territory in the mass tort class action field. Each case brings with it such uniqueness that routine items such as trial plans are often matters of first impression. *Id.* at 571. The instant case is no exception.

### iii) Skill Required to Perform the Legal Services Property

A prominent factor throughout the testimony on April 18 was the stamina, discipline and continuity of the Plaintiffs' Steering Committee and its staff for the life of the litigation. The team at the inception of the case was primarily the same team represented at the fairness hearing eleven years later, i.e., ten attorneys and their partners and staff.

The PSC litigated against attorneys representing the largest chemical companies in the world, attorneys representing the hundreds of third party defendants, and attorneys representing national and international insurance companies. Active litigation in the same case for 11 years is unique in the experience of this Court, and the fact that the same team persevered throughout the different fazes and faces of this case is remarkable. Liaison counsel testified that none of the members of the PSC realized the dynamics of the case when suit was filed. He further testified regarding the toll of such a rigorous case on counsels' personal lives. The Court duly notes the exceptional skills in organization, accounting, litigating, discipline, cooperation, and team work which were attested to at the hearing. In addition, members of the PSC filed into the record affidavits of their work experience.

### iv) Preclusion of Other Employment

The Plaintiffs' counsel testified that while this case did not preclude him from accepting other work, at times he and other members were precluded from working on other cases because of the demands of this case. Particularly from the time of the first settlement agreement in April 1995 through this fairness hearing, the Court will observe that the

pace of this litigation has been torrid. Settlement negotiations have been constant. Beginning in the fall of 1996 and into February 1997, Phase II, the dispositive motions involving the insurers and the direct action plaintiffs, has itself almost consumed the Court's docket.

### v) Customary Fee

The Fifth Circuit described this factor as "the customary fee for similar work in the community," with the knowledge that various types of legal work command different scales of compensation. *Johnson v. Georgia Highway Express,* 488 F.2d at 718. Without question, this Court considers *Combustion* to be unique among the group of mass tort complex litigation class actions, so the determination of "customary" is problematic. For this reason, among others, this Court has elected to evaluate the attorneys' fee award as a percentage of the fund reasonable under the circumstances.

Notwithstanding, the PSC provided expert testimony as to reasonable hourly rates in the community for attorneys with similar work experience as the members of the committee. In support of the percentage of the fund approach, this Court demonstrates the calculation of lodestar-multiplier, *infra,* utilizing the "customary fee."

### vi) Whether Fee is Fixed or Contingent

The percentage of fund fee award is similar to a contingency fee. Testimony at the hearing provided that most of the contracts with Class members were contingent-fee based. The Court is only considering an aggregate percentage request by all attorneys at this time.

### vii) Time Limitations Imposed by the Client

The *Johnson* Court stated that this factor is particularly important when a new counsel is called in to prosecute the appeal or handle matters at a late stage in the proceeding. *Johnson v. Georgia Highway Express,* 488 F.2d at 718. This factor has no relevance to this particular case.

### viii) Amount Involved and the Results Obtained.

This factor deserves some attention. First, the success of this action to date obviously is to be measured by the size of the settlement fund, approximately $127,000,000. But more important than just the dollar amount is the important public policy advanced. Testimony at the hearing indicated that for years, residents near the site had tried unsuccessfully to focus attention on their concerns about emissions from the site and the danger of living near the site, but to no avail. These residents were fearful about their homes, families, livestock, and livelihood. It was only after Plaintiffs' counsel filed the initial lawsuit in 1986 that public attention was focused on the site, that it was declared a Superfund site, that potentially responsible parties were identified, and that the process of cleanup began. It is the opinion of the Court that this public service is the singular greatest result for the Class, for Livingston Parish, and for the State.

### ix) Experience, Reputation and Ability of the Attorneys Involved

In the opinion of the Court, all of the attorneys involved in this case have performed exceptionally well under the most trying of circumstances. Members of the PSC are specialists in this type of litigation and enjoy a national reputation. Affidavits of the committee members attesting to their work experiences are filed into the record.

### x) Undesirability of the Case

The Court finds that the combination of particularly difficult factors tended to make this case unattractive in 1986. These factors are discussed at length in prong 4 of the *Reed* factors, *supra.* The fact that this case seemed to become even less desirable over the ensuing 9 years only tends to bear out the original premise, that at the outset the Plaintiffs' counsel faced a substantial risk that the case would yield nothing in return. Causation was the obvious hurdle in the initial consideration of the viability of the case, and it continues to be the thorn in the Plaintiffs' case today.

Other factors adding to the difficulty of the case are the length of time of the injury-causing activity, potential financial commitment, novelty and uncertainty of the law and procedure of mass tort class actions, and physical and emotional demands of the case.

Risk, as measured at the outset of the case, was indeed high. Testimony at the hearing showed that Plaintiffs counsel had difficulty recruiting members of the committee, especially trial counsel. In addition, liaison counsel described the emotional and financial drain of nine years of absolutely zero return on investment. He described the dim prospects of settlement even after nine years and the realization of being inextricably intertwined in this litigation. Excerpts from testimony of Plaintiffs' Liaison Counsel are revealing:

> When we announced the first settlement of $80 million, I probably had 20 some-odd phone calls from lawyers saying they sure wished they were involved in this case. When we were trying to put together a trial team, we had two very prominent trial lawyers turn the case down; wouldn't even look at it. We have others that would not look at it.

*Transcript April 18*, p. 144.

> You get into it and you cannot get out. There is no way to go back.... The responsibility is hard to describe. You have your clients who have come to you and you have undertaken some type of contractual obligation to represent them. But, you know, a lawyer can fire a client just like a client can fire a lawyer. But then you have the absentees that the Court has appointed you to represent, the putative class members who become class members. There is no solution to it.... You cannot go to the Court and say because I can't make this payment to the expert that is charging me $25,000 to fly in from California, he is not going to testify. You have to come up with the money.... That's it.

*Transcript April 18*, p. 136.

> We're talking about 11 years, ... I don't know that I would ever want to get involved in another case of this nature. I'll let my committee members make their in-

dependent determinations. It has certainly been very hard for us who practice law in Livingston Parish.... It has taken a long time. But there was one point that we had very, very serious, serious reservations as to whether we would be able to retrieve even enough money to cover the costs that we had incurred in this case. And I remember that conversation with Mr. Unglesby [a committee member] that occurred many years ago.

*Transcript April 18*, p. 146.

The Plaintiffs' case is not clear-cut today, 11 years and miles of documents after it was filed. Testimony supports the fact that the Plaintiffs' counsel had a difficult time rounding up a group of attorneys to pool resources for this litigation. It is clear to the Court that one obvious reason was that the risk of losing was enormous.

### xi) Nature and Length of the Professional Relationship with the Client

The court in *Johnson* commented that a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office. *Johnson v. Georgia Highway Express*, 488 F.2d at 718. In a class action of this nature, the implication of this type of relationship is not relevant.

### xii) Awards in Similar Cases

Notwithstanding this Court's conclusion that this case is in a class of its own, common fund cases in the Fifth Circuit are cited in the general discussion of fee awards, *supra* at V.B.3.a)iii). In particular, the award in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D.La.1993) was ⅛ in fees from a settlement fund of $170,000,000, and in the opinion of counsel involved in both litigations, the workload in the instant case dwarfs that in *Shell.*

Having considered the *Johnson* factors in relation to the Special Master's recommendation of a 36% fee reserve, this Court concludes that the extraordinary circumstances of this litigation and perhaps the even more extraordinary success in settlement negotiations underscores the remarkable effort of

the PSC and weighs heavily in favor of a fee award for plaintiffs' counsel well above an average, or benchmark, award for a case of this magnitude. At the hearing, the Special Master explained his recommendation:

> If I can be specific, what I was called upon to do by this Court was not to set the attorney fee—and I think that is the question the gentleman of the Class had. What I was asked to do was to set a maximum reserve as though you would set a household budget, so that I could start the process of analyzing the claims to make a distribution. . . . The role then shifts into the actual setting of the attorneys' fee. As Judge Haik said, that is his responsibility.
>
> So what I recommended to get the process started was a maximum reserve for attorneys' fees of 36% . . . . I used as a benchmark a standard—what I consider to be a standard contingency fee of (33 ⅓ )% . . . . I do know from my experience, because I do this for a living, that in heavy complex litigation in many cases the percentages rise above the (33 ⅓)% because of the risks, the expenditure, the time, the money, the dollar and so forth . . . . I suggested to Judge Haik . . . a maximum reserve of 36%, and then its up to the Judge to decide . . .

*Transcript April 18,* testimony of Patrick Juneau, pp. 188–192.

Considering a benchmark standard of between 20% and 30%, this Court finds that a fee reserve of 36% of the Settlement Fund on hand, or approximately $45,952,560, is quite reasonable and fair to the Class and to Plaintiffs' counsel under the circumstances. The primary factor in the Court's decision for this award is the risk factor. The PSC carried this case for a decade with zero return, and nine years with no indication that settlement was more probable than not. The first settlement was not consummated until April 1995, and until that sudden twist in negotiations, the prospect for relief for the PSC from the financial and emotional drain of this case were nowhere in sight. It is safe to conclude that at the end of 1994, this case was even less desirable that it was at its inception.

By 1994, the PSC had labored thousands of hours opposed by teams of highly skilled defense lawyers representing the largest chemical companies in the world. There was extensive motion practice involving two unsuccessful removal efforts, class certification, and the application for Multi-district consolidation argued before the Multi-district Litigation Panel. In addition, other major battlegrounds were prescription, expert testimony under *Daubert,* effects of changes in the law over the 30 years period, and punitive damages. Until "the dam broke" in April 1995, an expression used frequently by counsel representing both sides, the burden of carrying *Combustion* was likened to the great black hole in the universe.

As the first wave of settlements was consummated, hundreds of additional parties were added to the litigation, and the PSC faced new rounds of negotiations with insurance defense attorneys representing the largest insurance companies in the country. Major areas of dispute arose over the choice of law governing the insurance contracts, availability of the Louisiana Direct Action Statute, and applicability of exclusions in insurance policies, i.e., the sudden and accidental and the absolute pollution exclusion.

Obviously the PSC fought to add the insurers, but the Court recognizes the enormity of effort required to bring a named party to amicable settlement. The PSC conducted 285 depositions, and absorbed the resulting costs of court reporters, travel, witness fees, and living expenses. Roughly 2,000 motions have been filed requiring research, memoranda, and in most cases argument before the Court. The Court has held more than 900 hearing and has issued more than 2,600 Orders and Minute Entries regarding the case. Class counsel developed sophisticated computer models to track and analyze their case

The Court established a Joint Document Depository in 1995 where all of the discovery materials are available for any party's reference. The PSC has contributed more than $60,000 to maintain this resource. Simultaneously, the PSC was involved in intense negotiations with more than one hundred

counsel representing hundreds of defendants, third party defendants, and insurers. This work required time, expense, and great skill and ingenuity, all to the benefit of the Class. The Court notes that in the absence of vigorous and competent Class counsel, there would be no recovery. The success of the PSC under these circumstances amply supports the Court's decision to set the fee reserve at 36%.

A sample lodestar—risk calculation supports this conclusion. The PSC submitted a total of 51,121 hours of work done by the 10 committee members and partners in several of the committee members' firms. Plaintiffs' expert testified that all of the attorneys on the committee were experienced attorneys and had been practicing in the community for many years. A reasonable hourly rate for the services of these individuals was $300 per hour. *Transcript April 18, testimony of Judge Roberts pp. 101–116, particularly p. 105.*

While this sample reflects the majority of hours the Court would use in a complete lodestar calculation, it does not include the hours of independent attorneys who represent Class members. This hourly total is low, meaning the lodestar is underestimated, and the multiplier is necessarily higher to support the Court's 36% award. Even so, the calculation is telling. Using only this sampling of hours at the hourly rate of $300, the lodestar is 15,336,300. A risk multiplier of only 2.99 is needed to equal the Court's award of 36%. (Multiply the lodestar by the multiplier to approximate the total reserve for the fee award of $45,952,560). Under the true lodestar calculation, an even lower factor would justify the 36% award.

Judge Roberts, PSC expert on fees, testified at the hearing that the nature of this case made it "four times as difficult as a products liability case." *Transcript, April 18*, p. 116. Considering all of the factors and for all of the reasons discussed above in light of the public policy advanced, this Court is of the opinion that a risk factor of 2.99 is conservative. The multiplier is certainly well within the range of 1–4 discussed above, and below the 3–3.5 factor supported by similar reasons in *In re Shell Oil Refinery,* 155 F.R.D. at 573.

In the instant case, the 36% fee award is an aggregate, based on the collective efforts of the committee members and independent counsel of record. This is not necessarily to say that the actual individual awards will exhaust this reserve though the analysis of this Court may support such a result. However, for the current purpose of setting aside a maximum reserve from the Settlement Fund to arrive at a dollar amount to be disbursed to the Class, 36% reserve for fees is reasonable under the circumstances.

Further, this Court intends that aside from these specific reserves, not one penny more from the Claimants' Fund as of the date of this order shall be paid for attorneys' fees, or for the specified costs of litigation, Class administration, and Class distribution. This Court encourages Plaintiffs' counsel to utilize best efforts to understandingly, sympathetically, and professionally arrive at a mutual agreement as to the individual allotment of fees. Although compromise generally leaves both parties partially dissatisfied, so does a judicial award for attorney's fees. Any unresolved disputes shall be submitted to the Court at the proper time, and the resolution of such disputes shall remain under the exclusive jurisdiction of this Court.

## C. Objections to Phase II

Of the 10,000 claimants, only four claimants filed objections to the second part of the hearing. The Court offered Class members the opportunity to question each witness at the hearing. Mr. Charles Darby asked that a special medical fund be provided for "the victims of this action" for future medical care. Certainly one of the options the Court will seriously consider is the use of any excess funds in the reserves to fund some type of continuing medical monitoring and medical assistance for the claimants.

The objection filed by Fran Evans Powers regarding the reasonableness of the fee reserve has been addressed in detail in this Ruling. Katie M. Langley asked the Court for an accounting of the funds to date. The Court specifically asked the financial expert for the PSC, Hugh Sibley, to step through the accounting in answer to this claimant's

request. *See Transcript April 18, pp. 163–173, pp. 181–187, Exhibit FH3-0-2.* The transcript is now in the record of this case as is the referenced exhibit. Finally, Mr. Robert Sims, Jr. expressed dissatisfaction with the reserves in general. The Court has painstakingly analyzed each obligation and is satisfied that the finding supported in this Ruling and Final Judgment are equitable to all interested parties.

## VI. Conclusion

The Court approves as proposed the Second Supplemental Preliminary Settlement Agreement, the Third Supplemental Preliminary Settlement, the Fourth Supplemental Preliminary Settlement, and the Fifth Supplemental Preliminary Settlement Agreement. These four agreements add approximately .$32,451,150 to the Settlement Fund on hand, bringing the total amount to about $127,396,000.

Further, the Court adopts the recommendations of the Special Master as proposed:
1) 6% for Litigation costs;
2) 6% for Class administrative costs;
3) $500,00 plus accrued and future interest on the Settlement Fund for Class distribution costs and taxes;
4) $2,000,000 Indemnity Fund in favor of the compromising parties to be held for a period of 13 months after the conclusion of the litigation in all respects, after which it will be disbursed at the Court's discretion for the benefit of the Class;
5) $1,000,000 PSC liability fund for protection of all claims against the PSC for a period of 13 months after the conclusion of the litigation in all respects, after which it shall be disbursed at the Court's discretion for the benefit of the Class; and
6) 36% for attorneys' fees.

The Court incorporates the following stipulations regarding management of the reserves:

1) The maximum reserves and these stipulations for management of the reserves shall apply to the principal Settlement Fund on hand as of March 7, 1997 and all accrued interest on this amount to date and thereafter.

2) Any payment or withdrawal from any of the reserves shall be made by Order of the Court, and then only upon recommendation of the court-appointed-disbursing-agent (CADA) and in accordance with the relevant stipulation stated herein. The request shall be presented to CADA with the appropriate documentation. CADA shall review, summarize, and categorize each request and make its recommendation accordingly to the Court, attaching the request, documentation, and certificate of review. The Court may then issue a formal order or other action the Court deems appropriate and in the best interest of the Class.

3) Withdrawal of funds and intra fund transfers as specified in 2) shall be allowed without further notice to the Class.

4) Intra fund transfers shall be allowed exclusively among the Class administration reserve, the litigation reserve, and the Class distribution reserve.

5) Intra fund transfers shall not diminish the amount of the Claimants' Fund.

6) The amount of the attorneys' fee reserve, as designated by this Judgment shall not be enhanced by any funds from the other maximum reserves or the Claimants' Fund. The Court shall only allow payments out of and intra reserve transfers from the attorney's fee reserve but only after following the procedure stipulated herein and only after notice to all plaintiffs' counsel and a hearing on the matter.

7) Request for payment, withdrawal, or transfer of funds from the Indemnity Fund must be made by motion and served on all plaintiffs' attorneys of record and through Liaison Counsel, and on all settling parties who shall be given the opportunity to be heard by the Court before any action is taken on the matter.

8) Request for payment, withdrawal, or transfer of funds from the PSC Liability reserve must be made by motion and served on all attorneys' of record, or on a Court-designated plaintiffs' Liaison Counsel, and these parties shall be given an

opportunity to be heard by the Court before any action is taken on the request. 9) The purpose of setting these reserves at maximum amounts is to determine a minimum amount of funds available for immediate disbursement to the Class. Any amount remaining in any of the reserves after payment of the appropriate expenses, after any necessary transfers, and after the appropriate lapse of time shall be used for the benefit of the Class at the discretion of the Court.

The PSC shall prepare and submit for approval to the Court the proper notice to the Class regarding exact distribution amounts in a timely manner in preparation for the August 15, 1997 distribution hearing.

The Special Master shall continue the process of allocation for disbursement.

## EXHIBIT 1

### *LIST OF DEFENDANTS AND THEIR INSURERS TO BE INCLUDED IN THE FINAL JUDGMENT APPROVING THE SSPSA, TSPSA, 4thSPSA, AND 5thSPSA,*

#### *SSPSA*

Bagwell Coatings, Incorporated and the following insurers:

 The Home Insurance Company

 Reliance Insurance Company

 Fireman's Fund Insurance Company and National Surety Corporation, their affiliates, subsidiaries, and any related companies

Classic Car Imports

Deere & Company and the following insurer:

 John Deere Insurance Company

Delta Commodities, Inc. and the following insurers, including but not limited to:

 Travelers Insurance Company

 Travelers Indemnity Company

 Hartford Accident and Indemnity Company

 Certain Underwriters at Lloyd's London and Certain London Market Insurance Companies

 Utica Mutual Insurance Company and insurers subscribing to any and all policies issued to Delta Commodities, Inc. by New York Marine Managers

 Somerset Marine, Inc.

Doran's Car Care Center, Inc. # 1

Pirelli Armstrong Tire Corporation and the following insurers:

 *Primary Carriers*

 The Aetna Casualty & Surety Company

 General Accident & Life Assurance Group

 Liberty Mutual Insurance Company

 Travelers Insurance Company

 Allianz Insurance Company

 *Excess Carriers*

 Bellefonte Insurance Co.

 Certain Underwriters at Lloyd's, London and London Market Insurers, improperly named as 'Certain Underwriters at Lloyd's of London'

 Various London Companies c/o C.T. Bowring & Company

 Home Insurance Company

 Lexington Insurance Company

 Northbrook Insurance

 Granite State Insurance Company

 National Union

 Geico

 Employers Mutual Casualty Company

 Great Southwest

 St. Paul Surplus Lines Insurance Company, its Parents, Affiliates, Subsidiaries, Predecessors, Successors–in–Interest and any Related Companies

 First State Insurance Company

 Allianz Underwriters, Inc.

 Royal Indemnity Company

 Republic Insurance Co.

 Transamerica Premier Insurance

 Harbor Insurance Company

 Insurance Company of North America

 Midland Insurance Company

 American Centennial Insurance Company

 Safety Mutual Casualty Corporation

 Aetna Casualty and Surety Company

 H.S. Weavers

U.S. Fire

Federal Insurance

Southern Equipment, Inc. and the following insurers:

Zurich Insurance Company

American Guarantee and Liability Insurance Company

Southern Steamship Agency, Inc.

Terrebonne Motor Company, Inc./Dick Barker, Inc. and the following insurers:

Boston Old Colony Insurance Company

Continental Insurance Company

Fireman's Insurance Company of Newark

Insurance Company of North America

Pacific Employers' Insurance Company

Sayre and Toso

United States Fidelity and Guaranty Insurance Company

*TSPSA*

Exxon Corporation

Shell Oil Company, Shell Chemical Company, and Shell Western E & P, Inc.

CIBA–Geigy Corporation and the following insurers solely in their capacities as insurers of CIBA–Geigy Corporation:

Aetna Casualty and Surety Company

Aetna Casualty Company

AIU Insurance Company

Allianz Insurance Company

Allianz Underwriters Insurance Company

Allianz Versicherungs Aktiengesellschaft

American Centennial Insurance Company

American Employers' Insurance Company

American Home Assurance Company

American International Underwriters

American Re–Insurance Company

Baloise Insurance Company

The Baloise Insurance Company of America

Bercanus

Birmingham Fire Insurance Company

Birmingham Fire Insurance Company of Pennsylvania

California Union (now known as Cigna Specialty Insurance Company)

Central National Insurance Company of Omaha

CIGNA Specialty Insurance Company formerly California Union Insurance Company

City Insurance Company

Colonia Versicherungs Aktiengesellschaft

Colonial Insurance Company

Employers' Liability Assurance Corporation, Ltd.

Employers' Mutual Casualty Company

European General

European General Reinsurance Company

European General Reinsurance Company of Zurich

Everest Reinsurance Company f/k/a Prudential Reinsurance Company

Excess Insurance Company, Ltd.

Federal Insurance Company

Fidelity and Casualty Company of New York

Financial Guaranty Insurance Company, formerly Tarrytown Insurance Company, formerly Switzerland General Insurance Corporation of New York

Fireman's Fund Insurance Company, its affiliates, subsidiaries, and any related companies

First State Insurance Company

Gerling–Konzern

Gibraltar Casualty Company

Granite State Insurance Company

Great American Insurance Company

HDI

Haftpflichtverband der Deutschen Industrie V.a.G.

Harbor Insurance Company

Highlands Insurance Company

The Home Insurance Company

INSCO

INSCO Limited

Insurance Company of North America

Insurance Company of North America (INA)

The Insurance Company of The State of Pennsylvania

Integrity Insurance Co.

Interstate Fire & Casualty Company

Interstate Fire & Casualty Insurance Company

Lexington Insurance Company

Liberty Mutual Insurance Company

Louisiana Insurance Guaranty Association as guarantor of Pine Top Insurance Company

Louisiana Insurance Guaranty Association as guarantor of Transit Casualty Company

Certain Underwriters at Lloyd's, London and London Market Insurers, improperly named as 'Lloyd's Underwriters at London' and 'Underwriters at Lloyd's of London'

Lumbermen's Mutual Casualty Company

Mead Reinsurance Company

Mead Reinsurance Corporation

Midland Insurance Company

Midland Insurance Corporation

National Casualty Company

National Casualty Insurance Company

National Union Fire Insurance Company of Pittsburgh, PA

New England Insurance Company

Northbrook Property and Casualty Company (improperly named and defense handled by Allstate Insurance Company, successor-in-interest to Northbrook Excess and Surplus Insurance Company, formerly Northbrook Insurance Company)

Pacific Insurance Company

Republic Insurance Company

Royal Indemnity Company

Royal Insurance Company

Royal Insurance Company of America

Safety Mutual Casualty Corporation

Swiss Reinsurance Company

Switzerland General Insurance Company Limited

Twin City Fire Insurance Company

Twin City Insurance Company

Underwriters at Lloyd's and Insurance Companies subscribing to the excess CGL Policies

Uniguard Security Insurance Company

Uniguard Security Insurance Company, as successor in interest to Unigard Mutual Insurance Company

Utica Mutual Insurance Company

Westport Insurance Corp.

Westport Insurance Corporation, formerly Manhattan Fire and Marine Insurance Co., formerly Puritan Insurance Co.

Zurich Insurance Company

Zurich International (Bermuda) Ltd.

Zurich Limited International

PetroChem Maintenance, Inc. and the following insurers solely in their capacities as insurers of PetroChem Maintenance, Inc.:

Maryland Casualty Company

Zurich Insurance Company

Boston Old Insurance Company

CNA Insurance Company

Commercial Insurance Company

Continental Insurance Company

Western Auto Supply Company and the following insurers solely in their capacities as insurers of Western Auto Supply Company:

Allstate Insurance Company

American Insurance Company, its affiliates, subsidiaries, and any related companies

Chubb Group of Insurance Companies

Commercial Union Insurance Company

Continental Casualty Company

Federal Insurance Company

Fireman's Fund Insurance Company, its affiliates, subsidiaries, and any related companies

International Insurance Company

Lexington Insurance Company

Lumbermans Mutual Casualty Company

Royal Insurance Company of America and Royal Indemnity Company

The Travelers Indemnity Company

The Aetna Casualty and Surety Company

United States Fire Insurance Company

P & W Industries, Inc. and the following insurers solely in their capacities as insurers of P & W Industries, Inc.

Transportation Insurance Company

Columbia Casualty Company

Houston General Insurance Company

First State Insurance Company

Louisiana Insurance Guaranty Association, as guarantor of Southern American Insurance Company

CNA Insurance Company

Magnetek, Inc./Universal Manufacturing Company, Inc.

Sears, Roebuck & Company and the following insurers solely in their capacities as insurers of Sears, Roebuck & Company

A.C.E.

Affiliated FM Insurance Company

AIG Companies (AIU Insurance Company/American Home Assurance Company/Granite State Insurance Company/The Insurance Company of the State of Pennsylvania/Lexington Insurance Company/National Union Fire Insurance Company of Pittsburgh, PA), incorrectly named by Plaintiffs only as AIG and by separate naming of: American Home Assurance Company; Granite State Insurance Company, incorrectly named separately only as Granite State; The Insurance Company of the State of Pennsylvania, Lexington Insurance Company an National Union Fire Insurance Company of Pittsburgh, PA, incorrectly named separately only as National Union

Allianz Insurance Company and Allianz Underwriters Insurance Company, incorrectly named by Plaintiffs only as Allianz Insurance Company

Allstate Insurance Company

Allstate Insurance Co., appearing solely as successor-in-interest to Northbrook Excess and Surplus Ins. Co., formerly Northbrook Ins. Co., incorrectly named separately as Allstate Insurance Company and Northbrook Ins. Co.

American Empire Surplus Lines Insurance Company

American Excess Insurance Company

American Home Insurance Company

American International Underwriters, incorrectly named by Plaintiffs as American International Underwriter

American RE

American Underwriters

Atlanta International Insurance Company

California Union

Century Indemnity Company/CIGNA Insurance Company, incorrectly named by Plaintiffs separately as Century Indemnity and CIGNA

Chubb & Sons, Inc.

Chubb Group of Insurance Companies

Columbia Casualty Company/Continental Casualty Company/Continental Insurance Company/CNA Insurance Company, incorrectly named separately and with CNA Insurance Company, incorrectly named separately only as CNA

Employer's Insurance of Wausau, a Mutual Company, Wausau International Underwriters and Wausau Underwriters Insurance Company (improperly named in part and in the Petition as Employers Insurance of Wausau and Wausau Insurance Companies)

Everest Reinsurance Company (formerly known as Prudential Reinsurance Company), incorrectly named by Plaintiffs as Prudential Reinsurance Company

Federal Insurance Company

Fireman's Fund Insurance Company, its affiliates, subsidiaries, and any related companies

First State Insurance Company

GASLIC, incorrectly named by Plaintiffs as Gaslic

Gibraltar Casualty Company

Harbor Insurance Company

Highlands Insurance Company

The Home Insurance Company, incorrectly named by Plaintiffs only as Home Insurance Company

Hudson Insurance Company

International Insurance Company, for itself and as successor-in-interest to International Surplus Lines Insurance Com-

pany and Crum and Forster, incorrectly named by Plaintiffs only as International Insurance Company, successor to International Surplus Lines Insurance Company

London Insurers, incorrectly named by Plaintiffs as Lloyd's and British Companies

Lumbermans Mutual Insurance Company

Lumbermans Mutual Casualty Company

Midland Insurance Company

Mission Insurance Company

Mutual Marine Office, Inc.

National Surety, its affiliates, subsidiaries, and any related companies

National Surety Corporation, its affiliates, subsidiaries, and any related companies

Pacific Indemnity

The Protective National Insurance Company of Omaha, incorrectly named by Plaintiffs only as Protective National Insurance Company

Republic Insurance Company

Royal Indemnity Company, incorrectly named by Plaintiffs as Royal Excess

Utica Mutual Insurance Company/Employers Mutual Casualty Co., incorrectly named by Plaintiffs only as Employers Mutual Casualty

Western Employers Insurance Company

X.L. Insurance Company, Ltd., incorrectly named by Plaintiffs only as X.L.

Louisiana Insurance Guaranty Association, as guarantor of Integrity Insurance Company

Louisiana Insurance Guaranty Association, as guarantor of Mission Insurance Company

Affiliated FM Insurance Company

\*\*solely in its capacity as an insurer of Sears, Roebuck & Company

ERIC Reinsurance Company, successor to American Excess Insurance Company

\*\*solely in its capacity as insurer of Sears, Roebuck & Company

Sermatech International Incorporated and the following insurers solely in their capaci-

ties as insurers of Sermatech International Incorporated

Employer's Insurance of Wausau, A Mutual Company

Wausau Insurance Company

Wausau Underwriter's Insurance Company

Continental Casualty Company

CNA Insurance Companies

Malone Service Company and the following insurers solely in their capacities as insurers of Malone Service Company:

Continental Casualty

Continental Casualty Company

CNA Insurance Company

Continental Corporation

Continental Insurance Company

Fidelity and Casualty Company of New York

Liberty Mutual Insurance Co.

Protective National Insurance Company of Omaha

Reliance Insurance Company

Royal Beige Insurance Company

Royal Beige

Insurance Company of North America

Century Indemnity Company

Highlands Insurance Company

Highlands Underwriters Insurance Company

Highlands Casualty Company

Louisiana Insurance Guaranty Association as guarantor of Aspen Indemnity Company

\*\*solely in their capacities as insurers of Boyce Machinery Corporation

\*\*completes settlement with Boyce Machinery Corporation, per an assignment of insurance from previous settlement with Boyce Machinery Corporation

Zurich Insurance·Company

\*\*solely in its capacity as an insurer of Brouillette's Lift Service

\*\*completes settlement with Brouillette's Lift Service, per an assignment of insurance from previous settlement with Brouillette's Lift Service

Maryland Casualty Company

American Casualty Company of Redding

Transcontinental Insurance Company

Valley Forge Insurance Company

Audubon Indemnity Company

Reliance Insurance Company

Chicago Insurance Company

American General Fire and Casualty Company

North/West Insurance Company
 **solely in their capacities as insurers of Prairie Construction Company, Inc.; James Corporation of Opelousas; Central Manufacturing Company
 **completes settlement with Prairie Construction Company, Inc.; James Corporation of Opelousas; Central Manufacturing Company, per an assignment of insurance from the previous settlement with Prairie Construction Company, Inc.; James Corporation of Opelousas; Central Manufacturing Company

The Home Insurance Company, on behalf of The Home Indemnity Company
 **solely in its capacity as insurer of Canal Refining Company, a wholly owned subsidiary of Anchor Gasoline Corporation

The Home Insurance Company
 **solely in its capacity as an insurer of Reichhold Chemicals, Inc.

*4thSPSA*

PMAG Products, Incorporated, and Truck Insurance Exchange solely in its capacity as insurer of PMAG Products, Incorporated

Executive Risk Indemnity Inc., formerly known as ERIC Reinsurance Company, successor to American Excess Insurance Company Atlanta International Insurance Company

Century Indemnity Company, as Successor to CCI Insurance Company, as Successor to Insurance Company of North America, and in its capacity as Successor to CIGNA Specialty Insurance Company (f/k/a California Union Insurance Company)

Gotham Insurance Company

Monticello Insurance Company

National Union Fire Insurance Company of Pittsburgh, PA

SIA Insurance Company

United States Fire Insurance Company
 **solely in their capacities as insurers of K–Way/Acme–Dixie, Inc.

Entergy Louisiana, Inc. (formerly known as Louisiana Power & Light Company) and the following insurers solely in their capacities as insurers of Entergy Louisiana, Inc. (formerly known as Louisiana Power & Light Company)

Aetna Casualty and Surety Company (named as Aetna Casualty and Surety Insurance Company)

Allianz Insurance Company

Allianz Underwriters Insurance Company

American Home Assurance Company (named as American Home Insurance Company)

Bellefonte Underwriters Insurance Company (named as Bellefonte Insurance Company)

Century Indemnity Company (named as and f/k/a California Union Insurance Company)

Constitution State Insurance Company (named as Constitution State Insurance Company/Travelers Insurance Company)

Employer's Insurance of Wausau a Mutual Company (named as Employer's Insurance of Wausau)

Evanston Insurance Company

Fireman's Fund Insurance Company, its affiliates, subsidiaries, and any related companies

First State Insurance Company

Gibralter Casualty Company (named as Gibralter Insurance Company)

Hartford Accident & Indemnity Company (named as Hartford Accident and Indemnity)

Hartford Casualty Insurance Company (named as Hartford Casualty Insurance)

Highlands Insurance Company

Insurance Company of the State of Pennsylvania

Lexington Insurance Company (also named as Lexington/London)

National Fire & Marine Insurance Company (named as National Fire and Marine Insurance)

National Union Insurance Company (named as National Union Fire Insurance Company)

National Indemnity Company

North Star Reinsurance Corporation (named as North Star Re–Insurance Company)

Northwestern National Insurance Company

Nutmeg Insurance Company

Reliance Insurance Company of Illinois

Royal Indemnity Company (named as Royal Indemnity Insurance Company)

St. Paul Surplus Lines Insurance Company, its Parents, Affiliates, Subsidiaries, Predecessors, Successors–in–Interest and any Related Companies

Steadfast Insurance Company

The Travelers Indemnity Company (named as Travelers Insurance Company)

Twin City Insurance Company

Wausau International Underwriters, improperly named as Illinois Employers Insurance Company

Westport Insurance Co. (named as and f/k/a Puritan Insurance Company)

United States Postal Service

United States Fidelity and Guaranty Company and Fidelity and Guaranty Insurance Underwriters, Inc. (collectively, "USF & G")

\*\*solely in its capacity as alleged liability insurer under specific contracts allegedly issued to Canal Refining Company; Combustion, Inc.; Earl G. Dubose; and Meason Operating Company

Meason Operating Company, Inc.

Carolina Casualty Insurance Company solely in its capacity as an insurer of Younger Brothers

Associated Aviation Underwriters

\*\*solely in its capacity as an insurer of Louisiana Aircraft, Inc.

Associated Aviation Underwriters

United States Aviation Underwriters Incorporated and all member companies of the United States Aircraft Insurance Group

\*\*solely in their capacities as insurers of Paul Foumet Air Service, Inc.

*5thSPSA*

Global Settlement, which parties or entities are designated as follows:

Aetna Casualty & Surety Company, its affiliates, parents, subsidiaries, and any related companies

American & Foreign Insurance Company

American General Insurance Company

American General Fire and Casualty Company

American Home Assurance Company

The American Insurance Company, Fireman's Fund Insurance Company, National Surety, National Surety Corporation (individually and improperly served as 'National Surety'), their affiliates, subsidiaries, and any related companies

American Motorists Insurance Company

Associated Electric & Gas Insurance Services Limited

Auto–Owners Insurance Company

Baton Rouge Truck Center, Inc. and its predecessor corporation, Baton Rouge White Truck Sales and its individual officers and directors, George Hamilton, Patti Nohra and Stanley R. Hamilton

Bellefonte Underwriters Insurance Company

Bituminous Casualty Corporation

Bituminous Fire & Marine Insurance Company

Boston Old Colony Insurance Company

Buckeye Union Insurance Company

Carrier Insurance Company, Limited

Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, its affiliates, parents, subsidiaries, and any related companies (originally named as Insurance Company of

North America and erroneously named as CIGNA)

Certain Underwriters at Lloyd's, London and London Market Insurers, (as more fully described on the signature page, to the subscription agreement) who severally subscribed insurance policies issued to Avondale Shipyards, Inc./Ogden Corporation, Louisiana Power & Light/Middle South Utilities/Entergy Louisiana, Inc. and Evans Cooperage, Inc.

The Charter Oak Fire Insurance Company, its affiliates, parents, subsidiaries, and any related companies

Chubb Custom Insurance Company

Chubb Group of Insurance Companies, its affiliates, parents, subsidiaries, and any related companies

CNA Insurance Companies, its affiliates, parents, subsidiaries, and any related companies

Columbia Casualty Company

Constitution State Insurance Company, its affiliates, parents, subsidiaries, and any related companies

Continental Casualty Company

Continental Insurance Company, its affiliates, parents, subsidiaries, and any related companies

Compass Insurance Company

Employers Mutual Casualty Company

Evans Cooperage Company, Inc.

Everest Reinsurance Company f/k/a Prudential Reinsurance Company

Executive Risk Indemnity, Inc., formerly Eric Reinsurance Company, successor to American Excess Insurance Company

Federal Insurance Company

Ferro Corporation on its own behalf (sued as "Ferro Corporation") and on behalf of its Grant Chemical Division (sued as "Grant Chemical") and its former Cataphote Division "sued as Cataphote, Inc.")

Fidelity & Casualty Company of New York

First Horizon Insurance Company

First State Insurance Company

Gibralter Casualty Company

Granite State Insurance Company

Harbor Insurance Company

Hartford Insurance Group

The Home Insurance Company, as well as its predecessors, successors-in-interest and any affiliated companies

Iberville Motors, Inc.

The Insurance Company of the State of Pennsylvania

International Insurance Company for itself and as Successor in Interest, through corporate transactions or as Successor to the rights, obligations, and liabilities under the policies subject to this agreement through valid novation or otherwise, to International Surplus Lines Insurance Company and U.S. Fire Insurance Company

Lexington Insurance Company

The Louisiana Insurance Guarantee Association

The Louisiana Insurance Guarantee Association as Guarantor of Early American Insurance Company

The Louisiana Insurance Guarantee Association as Guarantor of Employers Casualty Company

The Louisiana Insurance Guarantee Association as Guarantor of Employers National Insurance Company

The Louisiana Insurance Guarantee Association as Guarantor of Integrity Insurance Company

The Louisiana Insurance Guarantee association as Guarantor of Midland Insurance Company

The Louisiana Insurance Guarantee Association as Guarantor of Mission Insurance Company

The Louisiana Insurance Guarantee Association as Guarantor of Southern American Insurance Company

The Louisiana Insurance Guarantee Association as Guarantor of Transit Casualty Company

The Louisiana Insurance Guarantee Association as Guarantor of Western Employers Insurance Company

Lumbermens Mutual Casualty Company

Mackenzie Chemical Works, Inc., its affiliates, parents, subsidiaries, and any related companies

MacKenzie Chemical Works of Louisiana, Inc.

Marine Office of America Corp.

Maryland Casualty Company

National Ben Franklin Insurance Company of Illinois

National Union Fire Insurance Company of Pittsburgh, PA

New Hampshire Insurance Company

Northwestern National Insurance Company

Northwestern National Insurance Company of Milwaukee, Wisconsin

Port Allen Marine Service, Inc.

Ranger Insurance Company

Reliance Insurance Company

Royal Indemnity Company

Royal Insurance Company of America

St. Paul Guardian Insurance Company, its parents, affiliates, subsidiaries, predecessors, successors-in-interest and any related companies

Selective Insurance Company f/k/a South State Insurance Company

Sentry Insurance A Mutual Company

Stonewall Insurance Company, as well as its predecessors, successors-in-interest and any affiliated companies

Transportation Insurance Company

The Travelers Indemnity Company, The Travelers Insurance Company, their affiliates, parents, subsidiaries, and any related companies

United General Insurance Company, Ltd. f/k/a Central Fire & General Insurance Company, Ltd.

United States Fire Insurance Company

Valley Forge Insurance Company

Vesta Insurance Company

Westchester Fire Insurance Company for itself and as Successor in Interest, through corporate transactions or as Successor to the rights, obligations, and liabilities under the policies subject to this agreement through valid novation or otherwise, to International Insurance Company

Dirt, Inc.

Lamar Allen Harrison

Lamar Harrison f/d/b/a Dubose Waste Oil

Younger Brothers, Inc.; Younger Brothers Incorporated; Younger Transportation, Inc.; Osage National Corporation; Dutch Enterprises, Inc.; Soo International, Ltd.; National Family Corp.; Rhinelan Leasing, Inc.; British Leasing, Inc.; and Younger Intermodal, Inc. and the following insurers solely in their capacities as insurers of Younger Brothers, Inc.; Younger Brothers Incorporated; Younger Transportation, Inc.; Osage National Corporation; Dutch Enterprises, Inc.; Soo International, Ltd.; National Family Corp.; Rhinelan Leasing, Inc.; British Leasing, Inc.; and Younger Intermodal, Inc.

Employers Insurance of Wausau, a Mutual Company, f/k/a Employers Mutual Liability Insurance Company of Wisconsin

Transport Insurance Company

National American Insurance Company of California, formerly

Mission American Insurance Company, formerly Transport Indemnity Insurance Company

Carolina Casualty Insurance Company

Certain Underwriters at Lloyd's, London and London Market Insurers subscribing to policies of insurance issued to Younger Brothers, Inc., et al

The Travelers Insurance Company

The Home Insurance Company and The Home Insurance Company on behalf of The Home Indemnity Company

**solely in their capacities as insurers of Combustion, Inc. and H. Arthur Gammons

Louisiana Insurance Guaranty Association as guarantor of Mission Insurance Company

**solely in its capacity as insurer of Combustion, Inc. and H. Arthur Gammons

EXHIBIT 2

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BATON ROUGE DIVISION

IN RE: COMBUSTION, INC. * MDL DOCKET NO. 94MDL4000
 HAZARDOUS SUBSTANCE THIS DOCUMENT RELATES TO
 CLEANUP LITIGATION * ALL CASES

**IMPORTANT NOTICE OF HEARING**

HAIK, District Judge.

TO ALL CLASS MEMBERS IN THE MATTER OF COMBUSTION, INC., HAZARDOUS SUBSTANCES CLEANUP LITIGATION WHO HAVE FILED TIMELY PROOFS OF CLAIM IN ACCORDANCE WITH ORDERS OF THE COURT.

**THIS NOTICE PERTAINS TO A HEARING TO BE HELD ON APRIL 18, 1997, BEFORE THE UNITED STATES DISTRICT COURT IN BATON ROUGE, LOUISIANA, TO CONSIDER A PROPOSED SETTLEMENT OF ADDITIONAL CLAIMS AND THE ESTABLISHMENT OF RESERVES FROM THE TOTAL SETTLEMENT FUND ON HAND TO CALCULATE THE FUNDS AVAILABLE FOR DISTRIBUTION TO CLASS MEMBERS (REFERRED TO AS THE CLAIMANTS' FUND). THIS NOTICE ALSO PERTAINS TO FURTHER PROCEEDINGS NECESSARY FOR ANOTHER HEARING TO BE HELD ON AUGUST 15, 1997, TO CONSIDER PROPOSED DISTRIBUTIONS TO CLASS MEMBERS FROM THE CLAIMANTS' FUND ESTABLISHED AS A RESULT OF THE HEARING ON APRIL 18, 1997. THESE NOTICES MAY VITALLY AFFECT YOUR RIGHTS AND YOU SHOULD READ IT CAREFULLY.**

Pursuant to the court's *Order for Implementation of Partial Distribution Process*, signed on 3/7/97, You are hereby notified that a hearing will be held on Friday, April 18, 1997, at the Federal Courthouse in Baton Rouge, Louisiana, at 9:30 o'clock A.M. before Hon. Richard T. Haik, United States District Judge, to consider the following:

1. The proposed Second, Third, Fourth and Fifth Supplemental Preliminary Settlement Agreements with additional compromising parties. These additional agreements have been preliminarily approved by the Court and are being submitted to the Class for a hearing to determine whether they should be given final approval by judgment of the Court. These agreements and their details are on file in the record of this case and at the office of the Special Master, whose address is shown below, and may be inspected by any Class member during regular business hours.

d. That the judgment approving the proposed settlement agreements and maximum reserves will provide that the Court may thereafter order payments to be made from the reserves, or may order intra-reserve transfers, without further notice to the Class provided that the amount of the Claimants' Fund as established at the hearing on April 18, 1997, shall not be impinged upon.

e. That the amount of disbursement of attorney fees and costs from the maximum reserves therefor shall be determined by the Court after the hearing on April 18, 1997, and once the judgment becomes final and executory, on petitions for fees and costs to be filed, as may be ordered by the Court, by the PSC and/or attorneys for individual Class members, all whom must have been enrolled as counsel of record herein as of March 7, 1997, being the date of this order.

f. That any class member desiring to object to the proposed settlements and establishment of reserves as set forth in the notice of hearing for April 18, 1997, must file written objection thereto, in writing and postmarked not later than midnight, April 11, 1997, stating the provisions of the notice as to which the objection is directed and the reasons therefor, and that the objecting Class member personally appear at the hearing for review of his or her objection.

g. That any Class member may be represented at the hearing by his or her personal attorney at the expense of the Class member.

This 7th day of March, 1997, at Lafayette, Louisiana.

United States District Court
Western District of Louisiana
Lafayette–Opelousas Division

In re: Combustion, Inc.

Action No. 94MDL4000
All Cases

Judge Haik

Magistrate Judge Tynes

**ORDER FOR IMPLEMENTATION OF PARTIAL DISTRIBUTION PROCESS**

Considering the *Plaintiffs' Motion for Implementation of Partial Distribution Process,* it is:

ORDERED that the remaining proposed settlements which were previously given preliminary approval by the Court, being the *Second Supplemental Preliminary Settlement Agreement* (SSPSA), the *Third Supplemental Preliminary Settlement Agreement* (TSPSA), the *Fourth Supplemental Preliminary Settlement Agreement* (4thSPSA) and the *Fifth Supplemental Preliminary Settlement Agreement* (5thSPSA), be assigned for hearing pursuant to Fed. R. Civ. Pro. 23(e), to be held at the Federal Courthouse in Baton Rouge, Louisiana, on April 18, 1997, commencing at 9:30 o'clock, A.M., with notice thereof, in the form to be prepared and approved as set forth hereinbelow, to be disseminated to all Class members who have filed timely proofs of claim at their last known addresses as reflected in the records of the PSC, or at such addresses as may be determined through diligent effort, including publication that the notice has been issued and is on file with the Special Master and posted in the office of the Clerk of Court for Livingston Parish.

FURTHER ORDERED that Patrick A. Juneau, Special Master appointed by the Court on July 16, 1996, submit to the Court forthwith his report and recommendations as to the nature and amount of any and all maximum reserves to be established in order to determine the amount of the Claimants' Fund available for partial distribution to Class members at this time.

FURTHER ORDERED that upon the Court's preliminary approval of the Special Master's report and recommendations as to the maximum reserves, or upon the modification thereof by the Court, the Plaintiffs' Steering Committee shall prepare and submit to the Court forthwith a proposed notice to be disseminated to Class members in accordance with the order first above requested and, upon approval or modification thereof by the Court, for immediate dissemination thereof in the manner set forth in the order first above requested, said notice to include, but not exclusively, the following provisions:

a. The total principal amount of settlement funds on hand for distribution in the event of final approval of the pending proposed preliminary settlement agreements.

b. The nature and amount of each maximum reserve preliminarily approved by the Court, and the amount of the Claimants' Fund thereby determined.

c. That upon final approval of the proposed supplemental settlement agreements and fixing of the maximum reserves following the hearing on April 18, 1997, the Court will (i) order the Special Master to submit to the Court by not later than July 1, 1997, a proposed plan of distribution of the Claimants' Fund as thus determined and, if approved or modified by the Court, disseminate to each Class member the amount of his or her individual distributive share of the Claimants' Fund; and (ii) assigning the proposed distributions for a hearing before the Class on August 15, 1997, with notice thereof to be disseminat-

ed in accordance with further orders of the Court.

d. That the judgment approving the proposed settlement agreements and maximum reserves will provide that the Court may thereafter order payments to be made from the reserves, or may order intra-reserve transfers, without further notice to the Class provided that the amount of the Claimants' Fund as established at the hearing on April 18, 1997, shall not be impinged upon.

e. That the amount of disbursement of attorney fees and costs from the maximum reserves therefor shall be determined by the Court after the hearing on April 18, 1997, and once the judgment becomes final and executory, on petitions for fees and costs to be filed, as may be ordered by the Court, by the PSC and/or attorneys for individual Class members, all of whom must have been enrolled as counsel of record herein as of March 7, 1997, being the date of this order.

f. That any class member desiring to object to the proposed settlements and establishment of reserves as set forth in the notice of hearing for April 18, 1997, must file written objection thereto, in writing and postmarked not later than midnight, April 11, 1997, stating the provisions of the notice as to which the objection is directed and the reasons therefor, and that the objecting Class member personally appear at the hearing for review of his or her objection.

g. That any Class member may be represented at the hearing by his or her personal attorney at the expense of the Class member.

This 7th day of March, 1997, at Lafayette, Louisiana.

Judge Richard T. Haik

RICHARD T. HAIK
JUDGE, U.S.D.C.W.D.LA.

## NEWSLETTER

## COMBUSTION, INC. LITIGATION

Vol.4 March 10,

---

## G O O D N E W S !!

United States District Judge Richard Haik has set August 15, 1997 as the hearing date for the long awaited proposed class members distribution. Assuming that the Court approves the additional supplemental preliminary settlement agreements, an additional $32,451,500 will be available for distribution. This will bring the principle sum available for distribution to a total of approximately $127,-396,000.

### Important Notice of Hearing and Order for Implementation of Partial Distribution Process

Please find enclosed Important Notice of Hearing and Order for Implementation of Partial Distribution Process signed by Judge Richard T. Haik on March 7, 1997 setting the class distribution hearing for August 15, 1997.

A hearing will also be held on Friday, April 18, 1997 at 9:30 a.m. at the Federal Courthouse in Baton Rouge to consider the proposed Second, Third, Fourth and Fifth Supplemental Preliminary Settlement Agreements.

Additionally, Special Master Juneau has recommended to the Court certain maximum reserves which will be considered by the Court for final approval on that date.

Written objections to the fixing of these reserves and/or to the Second, Third, Fourth and Fifth Supplemental Preliminary Settlement Agreements must be filed with the Special Master, 320 Third Street, Suite 104, Baton Rouge, LA 70801 and received by him or post-marked by April 11, 1997. Objections must state the specific provisions objected to and the reasons for the objection. The class member objecting must also appear at the hearing. Failure to appear may result in dismissal of the objection. If you do not wish to object you do not have to do anything at this time.

### Disbursement of Funds

If approval of the additional proposed settlements is granted and the reserves are

confirmed at the April 18, 1997 hearing and there are no appeals, the Court will thereafter order the Special Master to implement a plan of allocation and distribution of the then existing Claimants' Fund.

You will then receive notice of your proposed individual allocation. This will occur prior to the August 15, 1997 hearing. We anticipate disbursement of claimant funds shortly after all appeal periods have expired provided there are no appeals.

### Claims

The deadline for amending and/or supplementing Proofs of Claim expired November 15, 1996. However, please call the Office of the Special Master when you have a change of address or telephone number. It is your responsibility to notify the Special Master of any address or telephone number changes as soon as possible.

### Case Status

The Trial date of April 1, 1997, against the only remaining main defendant Chevron Chemical/Chevron, U.S.A., has been postponed by the Court pending the August 15, hearing for partial distribution.

*******************************************************************************

**Office of the Special Master**
320 Third Street, Suite 104
Baton Rouge, LA 70801
(504) 381–3034

Patrick Juneau, Special Master

Plaintiffs' Steering Committee

Calvin C. Fayard Jr., Liason Counsel
Bob F. Wright
Wendell H. Gauthier
Hobart O. Pardue
Richard P. Reina
David W. Robinson
W. Hugh Sibley
Lewis O. Unglesby
Raymond C. Vinet
Frank E. Edwards

---

### FINAL JUDGMENT

In consideration of the foregoing Ruling,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Second Supplemental Preliminary Settlement Agreement, preliminarily approved by the Court on August 26, 1996, the Third Supplemental Preliminary Settlement Agreement, preliminarily approved by the Court on September 18, 1996, the Fourth Supplemental Preliminary Settlement Agreement, preliminarily approved by the Court on January 8, 1997, and the Fifth Supplemental Preliminary Settlement Agreement, preliminarily approved by the Court on February 24, 1997, as subscribed by the Plaintiffs' Steering Committee on behalf of individually named plaintiffs and all Class members, and by all settling entities listed in Exhibit 1 of the Ruling are APPROVED AS PROPOSED, pursuant to Federal Rule of Civil Procedure 23.

IT IS HEREBY FURTHER ORDERED that for the purposes of this Judgment, the term "settling entities" shall include all persons and entities defined in the original Preliminary Settlement Agreement as the "Combustion Site Operators."

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the claims of the Class, the individuals members, and the Class representatives are dismissed with prejudice against each of the settling parties in the capacity that each settling party is listed in the Second, Third, Fourth Supplemental Preliminary Settlement Agreements, and the four individual subscription agreements in the Fifth Supplemental Preliminary Settlement Agreement, according to the terms of the subscription agreement to which that party has subscribed. Said claims are

dismissed with prejudice against the settling parties to the *in globo* agreement in the 5th SPSA in all capacities that they have appeared or that they could have been properly named in the Combustion Litigation, as this term is defined in the Preliminary Settlement Agreement, duly noting the exceptions subscribed to in the *in globo* agreement.

IT IS HEREBY FURTHER ORDERED that this Judgment shall not be deemed to include the claims of the Class against any non-settling party, and these claims shall proceed in accordance with the Court's further Orders and shall be subject to any non-settling defendant's right to claim setoff credit for Plaintiffs' settlement.

IT IS HEREBY FURTHER ORDERED that this Judgment shall not be deemed to include, bar, or to affect in any way, any and all claims, present or future, by any person other than a member of the Class for recovery, cleanup, remediation, or response costs, or attorneys' fees, costs or expenses under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, or any other similar state or federal law.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that subject to the stipulations set forth in this Judgment, *infra*, the recommendations of the Special Master with regard to maximum reserves from the Settlement Fund as of March 7, 1997, having a principal sum of approximately § 127,396,000, are APPROVED, namely,

1) Six percent (6%) for Litigation costs,

2) Six percent (6%) for Class administrative costs,

3) $500,000 plus accrued and future interest on the Settlement Fund for Class distribution costs and taxes,

4) $2,000,000 Indemnity Fund in favor of the compromising parties to be held for a period of 13 months after the conclusion of the litigation in all respects, after which it will be disbursed at the Court's discretion for the benefit of the Class,

5) $1,000,000 PSG Liability Fund for protection of all claims against the PSC for a period of 13 months after the conclusion of the litigation in all respects, after which it

shall be disbursed at the Court's discretion for the benefit of the Class, and

6) 36% for attorneys' fees, which maximum-cap reserve shall be the maximum percentage of fees allowed by this Court in this proceeding, regardless of any individual contract to the contrary.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the funds remaining in the Settlement Fund, after adjustment for the six maximum reserves, *supra*, shall comprise the Claimants' Fund and is HEREBY APPROVED.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the following stipulations shall govern the management of the reserves.

1) The maximum reserves and these stipulations for management of the reserves shall apply to the principal Settlement Fund on hand as of March 7, 1997 and all accrued interest on this amount to date and thereafter.

2) Any payment or withdrawal from any of the reserves shall be made by Order of the Court, and then only upon recommendation of the court-appointed-disbursing-agent (CADA) and in accordance with the relevant stipulation stated herein. The request shall be presented to CADA with the appropriate documentation. CADA shall review, summarize, and categorize each request and make its recommendation accordingly to the Court, attaching the request, documentation, and certificate of review. The Court may then issue a formal order or other action the Court deems appropriate and in the best interest of the Class.

3) Withdrawal of funds and intra fund transfers as specified in 2) shall be allowed without further notice to the Class.

4) Intra fund transfers shall be allowed exclusively among the Class administration reserve, the litigation reserve, and the Class distribution reserve.

5) Intra fund transfers shall not diminish the amount of the Claimants' Fund.

6) The amount of the attorneys' fee reserve, as designated by this Judgment shall not be enhanced by any funds from the other maximum reserves or the Claimants' Fund. The Court shall only allow payments out of and intra reserve transfers from the attorney's fee reserve but

only after following the procedure stipulated herein and only after notice to all plaintiffs' counsel and a hearing on the matter.

7) Request for payment, withdrawal, or transfer of funds from the Indemnity Fund must be made by motion and served on all plaintiffs' attorneys of record and through Liaison Counsel, and on all settling parties who shall be given the opportunity to be heard by the Court before any action is taken on the matter.

8) Request for payment, withdrawal, or transfer of funds from the PSC Liability reserve must be made by motion and served on all attorneys' of record, or on a Court-designated plaintiffs' Liaison Counsel, and these parties shall be given an opportunity to be heard by the Court before any action is taken on the request.

9) The purpose of setting these reserves at maximum amounts is to determine a minimum amount of funds available for immediate disbursement to the Class. Any amount remaining in any of the reserves after payment of the appropriate expenses, after any necessary transfers, and after the appropriate lapse of time shall be used for the benefit of the Class at the discretion of the Court.

IT IS HEREBY FURTHER ORDERED that the Court, on its own motion, may order the discretionary expenditure for the benefit of the Class, or the transfer to the Claimants' Fund any sums remaining in the maximum reserves, in whole or in part, upon the termination of the litigation in all respects and upon the certification of CADA that all required disbursements have been completed and that there is no further need for any balances on reserves.

IT IS HEREBY FURTHER ORDERED that any augmentation to the Settlement Fund as a result of future settlements or future proceedings will be managed by the Court in the manner deemed appropriate at that time, in accordance with the requirements of Fed. R. Civ. Pro. 23(e).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Claimants' Fund shall be distributed to the Class in accordance with further orders of this Court upon this Judgment becoming final and executory.

IT IS HEREBY FURTHER ORDERED that the Plaintiffs' Steering Committee shall prepare and file with the Court for approval the proper notice to the Class regarding the Class distribution hearing to be held on an approved date, and that the Special Master shall continue the process of allocation for this partial disbursement.

IT IS HEREBY FURTHER ORDERED that all distributions from the Claimants' Fund to persons not capable under Louisiana law to act for themselves, including minors, interdicts, successions or absentees, are to be preserved for the benefit of such incapacitated persons in bank accounts to be established and maintained pursuant to orders of this Court in the course of the distribution process.

IT IS HEREBY FURTHER ORDERED that individual claim allocations shall be subject to individual liens, assignments, and encumbrances but shall not be subject to the expenses described in the six maximum-cap reserves approved above.

IT IS HEREBY FURTHER ORDERED that claims for attorneys' fees to be assessed from the attorneys' fee reserve shall be considered at a separate hearing, pursuant to Fed. R. Civ. Pro. 54(d)(2), and shall be noticed and held at such time as fixed by the Court.

IT IS HEREBY FURTHER ORDERED that the Court shall retain jurisdiction over this action for all purposes necessary for further litigation of this matter, including litigation of the Class claims against nonsettling defendants, enforcement of the terms of the settlement agreements as approved, completion of the distribution process through the enforcement and implementation of this Judgment, and disbursement of attorneys' fees and costs. The Court's retention of jurisdiction shall not affect the finality of this Judgment approving the proposed settlements and the maximum reserves.

IT IS HEREBY FURTHER ORDERED that the Court finds no reason for delay and the Clerk of Court shall enter this Final Judgment pursuant to Fed. R. Civ. Pro. 54(b) and shall issue notice to liaison counsel for the settling parties and to plaintiffs' counsel of record. The Plaintiffs' Steering Committee shall issue notice to the Class by providing copies of the notice to Class members.